**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| K.A., <br><br>          Plaintiff, <br><br> v. <br><br> THE DISTRICT OF COLUMBIA, et al., <br><br>          Defendants. | Civil Case No.: 1-25-cv-2930 (SLS) |

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION</u>

**THE MATERIAL AVERMENTS**

The District's motion is properly assessed based on the well-pleaded allegations in Plaintiff K.A.'s complaint, not defendants' version thereof. Here is what K.A.'s complaint alleges about how the District placed K.A. into the hands of Kelvin Powell, a known child sexual assaulter:

Defendants have the responsibility for children incarcerated under its authority. ¶16[1]. Defendant District operates and controls DYRS, a department within the Executive Branch of the District of Columbia. ¶17-18. It bears absolute, non-delegable legal responsibility and the highest duty of care, under District of Columbia law, to ensure the safety, protection, and the wellbeing of vulnerable children who are housed within its facilities, including specific duties to protect

---

[1] Paragraph references in this motion are to those in Plaintiff's Complaint (ECF 5).

against sexual abuse and assault. ¶17-18. Pursuant to D.C. Code §2-1515.02, DYRS and the District are tasked with responsibility for the safekeeping, care, protection, instruction and discipline of all children committed to their institutions. ¶19. DYRS and the District bear the highest duty of care, under District of Columbia law, to ensure the safety, protection, and the wellbeing of vulnerable children who are housed within its facilities, including specific duties to protect against sexual abuse and assault. ¶18. DYRS is tasked with creating "environments that are safe, structured, stable and supportive" for youth. ¶20.

DYRS operates DC's Youth Services Center ("YSC"), a detention center that houses detained girls and boys in the juvenile justice system. ¶21. YSC is a long-troubled facility that has been plagued with issues of insufficient staffing and violence, which has been particularly harmful to children in need of rehabilitative care. ¶24.

Youth Development Representatives ("YDRs") are juvenile correctional officers at YSC. ¶28. DYRS policy dictates that male staff are not to be left alone on the girl's A100 unit. ¶32. DYRS policy dictates that there are to be two YDRs on a unit at any given time. ¶31. During all relevant times, Defendant Kelvin Powell (Powell or Powell) was employed as a YDR by Defendants District and DYRS. ¶¶23, 27. Powell was a 63-year-old male. ¶23. He was also a known sexual predator. ¶¶5, 78.

At all relevant times, Plaintiff was a pretrial detainee housed at YSC, and entitled to constitutional protections under the Fourteenth Amendment to the United States Constitution. ¶83.

From October 2021 to June 2022, K. A. was detained at YSC. ¶¶14, 25. K.A. was a minor of 17 years old. ¶25. Powell was nearly 40 years her senior. ¶27. K.A. was housed on A100, the only girl's unit in YSC. ¶26. Her cell was located in the girl's unit. ¶60. Powell was

tasked with supervision over K.A. ¶191. Powell was frequently the only DYRS staff member on the girl's unit, giving him easy access to K.A. ¶33.

Powell's assault of K.A. was ongoing, not an isolated incident. ¶62. Beginning in or about November 2021, Powell began grooming K.A., by showing her individual attention and doing special favors for her, like bringing her outside food and beverages. ¶35. From December 2021 to February 2022, Kelvin Powell kissed and groped K.A., made her perform oral sex, performed oral sex on her, and raped her. ¶2. Powell grabbed K.A.'s buttocks as she decorated an office door for Christmas; on multiple occasions, Powell entered K.A.'s cell and kissed K.A., groped her breasts and buttocks, and/or force her to grab and touch his penis; on multiple occasions, Powell as the sole staff member on the girl's unit, stood and/or sat outside of K.A.'s cell, and gestured and told K.A. take off her clothing for him and touch her breasts and body for him; and, Powell, again as the sole staff member on the girl's unit, told K.A. to go into a nearby cell and wait for him to come in there. ¶¶44-53. Once she was in the cell, Powell kissed K.A. ¶38.

In January and February 2022, Powell repeatedly took K.A. off the A100 unit alone to make level 5 phone calls – the type of calls for which a detained youth did not require parent or guardian approval. ¶¶39-40. DYRS policy disallows individual detained girls at YSC to be escorted alone by a single male staff person. ¶43. Yet, in order to make level 5 phone calls, Powell would walk K.A. alone off of the girl's A100 unit and into an individual staff office. ¶41. Powell used evening or night hours to take K.A. to make level 5 calls. ¶42.

Powell sexually assaulted K.A. in various staff offices during these level 5 phone calls: he told her to bend over the desk, and raped her; on at least five occasions, he forced K.A. to grab her own breasts; on at least five occasions, Powell grabbed K.A.'s breasts and buttocks; on

at least three occasions, Powell forced K.A. to grab his penis; on at least two occasions, Powell told K.A. to pull down her pants and expose her vagina and buttocks to Powell; on at least three occasions, Powell got behind K.A. and rubbed his penis against her buttocks; on at least one occasion, Powell told K.A. to put her leg on the desk and licked her vagina; on at least one occasion, Powell forced K.A. to perform oral sex on him; on at least one occasion, Powell licked K.A.'s buttocks; and on at least three occasions, Powell sat outside the staff office watching K.A. and telling her to expose her breast, buttocks and vagina for him to see. ¶44.

For his assaults of K.A., Powell has been criminally charged by the United States Attorneys' Office with both First and Second Degree Sexual Abuse of a Minor and is awaiting trial.[2] ¶8.

Defendants District and DYRS knew or should have known about Powell's repeated abuse of children at YSC long before K.A. arrived. ¶90. Powell had assaulted other children at YSC before his assault of K.A. ¶61. Powell was able to continue working at YSC after multiple prior documented incidents and formal complaints of sexual abuse. ¶¶78, 98. YSC never directly investigated or disciplined Powell in response to them. ¶¶65, 161, 170.

Years before K.A. was detained at YSC, Powell had sex with a 17-year-old resident, A.B., in exchange for money. ¶63. Powell showed a video of him having sex with A.B. and A.B. giving Powell oral sex to two staff members at YSC. ¶66. DYRS simply closed this investigation; it did not speak with the two staff members who had viewed the footage of Powell sexually abusing A.B. ¶66.

---

[2]After the filing of the instant case, Powell was convicted on 16 criminal counts related to his abuse of K.A., and sentenced to 20 years in prison.

Powell's multiple, documented prior incidents also include his sexual assault of three other young girls housed at YSC. ¶67-72. Powell touched A.M.'s buttocks, rubbed her thighs, and made sexual comments to her, abuse which continued even after she had left YSC. ¶68-69. Powell assaulted E.S. by placing his hand on her inner crotch area in YSC's intake room. ¶70. Powell had sexual intercourse with a former YSC resident, X.W. ¶71. He later revealed to other DYRS staff that he gave X.W. money for an abortion. ¶72.

Powell openly sexualized the girls housed at YSC: he spoke openly with other staff members about his desire to engage in in sexual acts with teens generally and teenage girls at YSC (¶77); he facilitated sex between young girls and other DYRS staff in exchange for money (¶75); he kissed a former YSC resident at a DYRS Hygiene Drive (¶73); and openly showed favoritism to girls over boys (¶76). His exploits earned him a nickname amongst DYRS staff, "Red Roof Inn", based on his habit of going to hotels to have sex with girls upon their release from YSC. ¶74.

Other staff members were also able to assault K.A. and other girls due to the failures and negligence of Defendants District and DYRS. ¶56. In February 2022, another DYRS female employee repeatedly worked while noticeably intoxicated, including interacting directly with the detained children. ¶57. In February 2022, on at least one occasion, another employee used her phone to show photos of her own naked breasts to K.A. and other girls and told them her sex life. ¶58.

YSC is equipped with a number of surveillance cameras in the girl's A100 unit, YSC hallways, and other locations, through which activity in units and halls of YSC are monitored and recorded. ¶30. Powell's repeated policy violations and accessing of K.A. for his sexual gratification were captured on YSC's security cameras. ¶37. Surveillance footage from

December 2021 to February 2022 captured Powell: repeatedly the lone DYRS staff member on the girl's A100 unit (¶47); repeatedly entering K.A.'s cell alone (¶48); looking back and forth before he entered and exited K.A.'s cell (¶49); gesturing for K.A. to go into her room, with Powell following behind her (¶50); adjusting his mask as he enters and exits these various rooms with K.A. (¶51); knocking on K.A.'s cell in the middle of the night and making gestures to her (¶52); and taking K.A. off of the girl's unit alone and escorting her alone to make level 5 calls (¶¶39-44).

YSC staff were assigned to actively monitor real-time surveillance footage from the cameras covering the area where K.A. was assaulted. ¶46. DYRS staff knew or should have known that Powell was sexually abusing, including raping, K.A. because surveillance cameras recorded him, a male and sole staff member, showing her special attention and favoritism, touching her buttocks, entering K.A.'s cell alone at night, and taking K.A. to make level 5 calls alone, walking into those offices behind K.A. alone, in direct violation of DYRS policies and basic standards for safeguarding children in detention. ¶91. DYRS did not use the security system to monitor the actions of the guards, YDRs ,or staff and either no one viewed the footage or they viewed and did not act upon surveillance footage that clearly showed an inappropriate conduct by Powell towards K.A. over a period of months. ¶53-54. Powell accessing the girl's unit alone was not the subject of any security or disciplinary review by DYRS. ¶34. Powell was able to repeatedly sexually assault K.A. due to the failures and negligence of Defendants District and DYRS. ¶54.

Defendants District and DYRS demonstrated shocking, systemic, and deliberately indifferent conduct amounting to reckless disregard for K.A.'s safety and well-being by chronically understaffing YSC, enabling Powell's repeated unsupervised access to the girls' unit,

which included Powell going into unoccupied cells alone after K.A.; going into K.A.'s cell alone; knocking on K.A.'s cell in the middle of the night and making gestures to her; taking K.A. off of the unit alone to make level 5 phone calls; entering the offices with K.A. alone; and grabbing K.A.'s buttocks on camera. ¶60.

While the District and DYRS maintained formal policies purportedly aimed at preventing sexual abuse and protecting detainees from harm, these policies were systematically, deliberately, and recklessly ignored through a widespread custom and practice of non-enforcement, including: (1) failure to investigate repeated complaints of sexual abuse; (2) failure to review surveillance footage showing staff violations; (3) failure to enforce basic safety protocols requiring two staff members present; and (4) tolerating known sexual predators on staff. rendering these policies mere window dressing that provided no actual protection to vulnerable youth in custody, as evidenced by the multiple documented instances of sexual abuse by Powell that went uninvestigated and/or unpunished. ¶87.

In practice, Defendants District and DYRS failed to take reasonable steps to implement or monitor compliance with its own written standards—rendering them ineffective and contributing to a culture of indifference. ¶86.  District and DYRS official policies prohibiting sexual misconduct were routinely ignored. ¶88.  The failures of the District and DYRS to enforce their own safeguards created a culture where abuse was foreseeable, unchecked, and rampant. ¶89.

Defendants District and DYRS had a duty to ensure the safety and humane treatment of the children in their custody, including protection from sexual abuse and assault. 84. Defendants District and DYRS failed to provide adequate staffing in order to ensure that sexual abuse does not occur, a non-delegable and ministerial duty. ¶92. DYRS policy states that two YDRs are

assigned to each housing unit at all times, with one assigned manager per floor to assist with oversight and assistance. ¶93. Powell was able to sexually assault K.A. because Defendants District and DYRS enabled Powell to enter the girl's A100 unit and remain there alone, repeatedly go into K.A.'s cell or follow her into unoccupied cells, and take her to make level 5 phone calls late at night, alone, even while recorded by facility surveillance cameras. ¶94.

The Defendants District and DYRS violated their mandatory reporting obligations under D.C. Code § 4-1321.02 by failing to report known and/or suspected sexual abuse of children by Plaintiff's abusers and/or their other agents to law enforcement and Child Protective Services. ¶115.

The District and DYRS demonstrated a pattern and practice of deliberately failing to properly train, supervise, and discipline correctional officers and staff, despite known risks of sexual abuse with respect to: preventing, recognizing, and responding to sexual abuse; Reporting and investigating complaints of misconduct and sexual abuse; ensuring adequate staffing of the facility, specifically but not limited to the girl's A100 unit and the control room; enforcing supervision and separation protocols for vulnerable detainees; ensuring staff accountability through progressive discipline or removal of problem staff members. ¶96 (a-d).

District was on notice, through multiple documented prior incidents and formal complaints, that its practices were grossly insufficient to prevent sexual abuse, yet deliberately failed to take any meaningful corrective action to protect vulnerable youth in its care. ¶98.

This deliberate indifference by Defendants District and DYRS both in their failure to enforce their stated policies and their failure to properly train and oversee staff was the moving force behind the constitutional injuries suffered by K.A, and the resulting claim for damages. ¶99.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of K.A.'s claims. Dismissal is only warranted if the defendant demonstrates that the plaintiff can prove no set of facts consistent with the allegations that would entitle them to relief. Under Federal Rule of Civil Procedure 12(b)(6), a plaintiff does not have to prove his case at the outset. Rather, the plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). All a complaint must do is "raise a reasonable expectation that discovery will reveal evidence." *Ctr. for Inquiry, Inc. v. Walmart, Inc.*, Nos. 20-CV-392, 20-CV-530, 2022 D.C. App. LEXIS 328, at *23 (Sep. 29, 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (emphasis added by Court of Appeals). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, and the court presumes  that general allegations embrace the specific facts that are necessary to support the claim. *Sierra Club v. EPA*, 352 U.S. App. D.C. 191, 292 F.3d 895, 898-99 (2002) (internal quotations omitted).

The pleading requirement at this stage is not steep, requiring assertions that are "more than labels and conclusions." *See Moonblatt v. District of Columbia*, 572 F. Supp.2d 15 (D.D.C 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). The Court's role is limited to assessing whether the factual allegations "nudge the claims across the line from conceivable to plausible." *Id.* at 570. This plausibility standard requires only enough factual matter to permit the Court to draw a logical inference that the defendant is liable; the complaint need not include detailed proof or anticipate defenses. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Crucially, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor, granting Plaintiff the benefit from all inferences that can be derived from the facts alleged. *Harris v. Gov't of the District of Columbia*, 2019 WL 3605877 (D.D.C. Aug. 6, 2019) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000)).

Plaintiff's complaint alleges detailed facts describing repeated sexual assault and misconduct, ignored warnings, violations of mandatory procedures, and systemic failures within the Youth Services Center, those allegations must be accepted as true and liberally construed. Under the governing standards described above, K.A. has plausibly stated claims for relief, and dismissal at this stage is improper.

## ARGUMENT

I. **K.A. Has Adequately Pled Municipal Liability Under Section 1983**

K.A.'s compelling factual allegations demonstrate that the District's systemic failure to protect K.A.—including its pattern of ignoring prior sexual misconduct, its failure to enforce mandatory safety policies, and its inadequate hiring, training, and supervision— that were the direct and moving force behind the repeated constitutional violations K.A. suffered.

### A. The District Repeatedly Ignored Sexual Misconduct by DYRS Staff, Creating a Custom Resulting in the Violation of K.A.'s Fifth Amendment Rights.

K.A. plausibly states a *Monell* claim based on the repeated behaviors of municipal employees that reached the level of a custom, specifically ignoring sexual misconduct by DYRS staff. *See* generally *Givens v. Bowser*, 111 F.4th 117, 122 (D.C. Cir. 2024) (quoting *Monell*, 436 U.S. at 694); *Blue v. District of Columbia*, 811 F.3d 14, 19 (2015). This claim is supported by

allegations recounting the prior incidents of sexual misconduct involving Kelvin Powell and other DYRS staff that were known to the District and, ignored and/or uninvestigated. ¶¶63-78. *Ryan v. Dist. of Columbia*, 306 F. Supp. 3d 334, 341 (D.D.C. 2018) (explaining pattern or practice could be demonstrated by evidence of consistent failure on numerous occasions). These were not "one off" allegations of prior misconduct, but multiple, egregious, documented allegations of sexual assault of children, involving formal complaints. DYRS employees participated in the prior misconduct by Powell (¶¶64, 66, 75) and DYRS failed to investigate or report these incidents to Child Protective Services (¶¶65, 66, 115). The District knew of these incidents and failed to act in response to them. ¶¶63-78, 115.

Pursuant to this custom, Powell subsequently engaged in a three-month period of grooming and preying on K.A., much of which was captured on surveillance cameras and witnessed by staff, as well as sexually assaulting her dozens of times. ¶¶30-38, 41, 44-53. The District concedes that Powell's recorded behavior was at least odd or inappropriate. ECF 6-1 at 14. But the District fails to acknowledge the allegation that Powell's mere presence on the girl's unit, alone and as a male, was a flagrant violation of DYRS policy. Powell's repeated lone presence on the girl's unit, over a period of three months, should have sent off alarm bells. DYRS policy requires two staff members to be present on all YSC units. ¶31. DYRS policy also prohibits male staff from being alone on the girls' unit. ¶32. DYRS policy further prohibits male staff from escorting girls alone. ¶43. K.A. alleges that these policies, which addressed risks of sexual misconduct, were entirely ignored. ¶88.

In December 2021, Powell was also captured on camera grabbing the buttocks of K.A., as she decorated a YSC office door for Christmas. ¶38. The District attempts to minimize this

sexual touching of a detained child by describing it as, "placing his hand(s) on her buttocks." ECF 6-1 at 14. The District argues that this was but "one instance" that cannot represent a pattern of misconduct. ECF 6-1 at 14. In fact, this sexual misconduct on a child in an office setting at YSC very much represents the pattern of misconduct that continued to unfold over the two months that followed. His touching of her buttocks conveyed to the District that Powell that his violations of DYRS policy were undertaken to sexually pursue K.A. The District indicated to Powell that he could act inappropriately, openly and on camera, and still escape accountability. Indeed, as Powell went on for days, weeks, and then months, lurking, ogling at, and spending time alone with K.A. on camera, it would become clear to him that DYRS staff watching the cameras were either not monitoring his misconduct or were unconcerned by it.

Plaintiff further alleges the District's custom and pled that DYRS staff worked together to enable the sexual abuse of children and help each other avoid detection. ¶151. Indeed, K.A. alleges that DYRS staff, with the help of Powell, had sex with children. ¶75. Further, it was known to Defendants' that Powell was a predator as he was known amongst facility staff as the "Red Roof Inn," based on information that he took young girls to a nearby Red Roof Inn and sexually assaulted them. ¶¶74, 113. This supports the inference that supervisors and staff were aware of Powell's nickname. The allegation that he kissed a former YSC resident at a public event, run and facilitated by the District, the Hygiene Drive (¶¶73, 114), supports the inference of widespread knowledge of his misconduct, for which he has never been disciplined. Powell was never reported to the police or authorities, rather he was kept on staff with the help and assistance of the District and given more access to young girls. These allegations, taken as true, further plead that the District had a custom of ignoring the sexual abuse of children that led to K.A.'s assault.

K.A. also sufficiently pleads that the District was deliberately indifferent to the risks to K.A. from its policy of inaction in response to the known prior incidents of abuse and to Powell's ongoing sexual assault of K.A. A plaintiff states a claim of deliberate indifference by pleading facts sufficient to contend that the District "knew or should have known of a risk that constitutional violations would occur, but did nothing." *Poindexter v. D.C. Dep't of Corr.*, 891 F. Supp. 2d 117, 121 (D.D.C. 2012) (citing *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003)). "Nothing" is exactly what K.A. alleges that the District did despite the fact that it knew or should have known of the risk, and even the likelihood, that Powell would assault another young girl, especially when Defendants repeatedly and regularly saw him on the girls' unit alone, escorting K.A. throughout YSC alone in violation of DYRS staffing policy. To make matters worse, all of these violations were recorded by Defendants' own surveillance cameras. *See* generally *Doe K.R. v. Choice Hotels*, No. 6:23-cv-1012-JSS-LHP, 2024 U.S. Dist. LEXIS 104200 (M.D. Fla. 2024) (constructive knowledge was demonstrated in part because the employer hotel's cameras repeatedly captured open sexual abuse by a third party).

**B. The District Failed to Investigate, Supervise and/or Train DYRS Employees, Causing K.A. to be Sexually Assaulted by Kelvin Powell.**

K.A. also plausibly states a *Monell* claim based on the District's failures to investigate, train, and supervise its DYRS employees. Here, K.A. has alleged multiple failures regarding prior incidents of sexual misconduct by Powell and others at DYRS and the District's failure to investigate Powell and other staff, despite documented accounts and formal complaints to DYRS. ¶¶63-78, 87, 96, 131. The District also failed to supervise or train those responsible for investigating those incidents, who had failed to do so, including ensuring that staff reported the

incidents to Child Protective Services as required by D.C. law and thoroughly investigated all claims. ¶¶87, 96, 115, 131, 162-165.

The Districts' failure to investigate, supervise and train continued during the three months over which Powell assaulted K.A. Despite the prior documented incidents of sex assault misconduct known to DYRS, Powell was allowed to repeatedly access K.A. as the sole YDR and male on the girls' unit, in violation of DYRS policy. ¶¶30-37, 45-52. Many of his actions were captured on DYRS surveillance cameras in the girls' unit and YSC hallways. *Id.* Indeed, footage shows Powell as the sole staff member on the girls' unit. Footage captures Powell going into K.A.'s cell and other cells with her and adjusting his mask when he walks out and sitting outside of K.A.'s cell watching and gesturing to her for his sexual gratification. *Id.* Moreover, Powell's conduct expanded beyond the girls' unit as he was allowed to repeatedly escort K.A. alone to make Level 5 phone calls – another open, repeated violation of DYRS policy captured on camera, through which Powell transported her to be assaulted. ¶¶41-45. Powell's obvious, ongoing, open, and recorded misconduct—both the staffing policy violations over those three months and the assaults themselves—was never investigated, disciplined, or subject to any training or retraining. ¶34.

The District further failed to supervise and train the DYRS staff responsible for watching the surveillance cameras. ¶¶34, 46, 56, 102. This was a breach of the District's mandatory, ministerial and non-discretionary duties to supervise correctional staff in accordance with established departmental policies, safety protocols, and federal PREA standards, as mandated by D.C. Code § 2-1515.04 and 34 U.S.C. § 30307. ¶102. In some circumstances, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Alexander v. Gov't of the D.C.*, Civil Action No. 17-1885 (ABJ), 2020 U.S. Dist. LEXIS 115856, at *22 (D.D.C. July 1, 2020) citing *City of Canton*, 489 U.S. 378 (1989). The unchecked, ongoing access to girls, here K.A., for Powell's sexual gratification demonstrated the obvious need for training of DYRS staff tasked with monitoring surveillance footage.

Taken together, the District's failures culminated in the foreseeable impunity with which Powell accessed and groomed K.A., and sexually assaulted her dozens of times over a period of three months.

The District's argument that Plaintiff has not sufficiently alleged a policy, custom, or practice giving rise to a constitutional injury misstates K.A.'s pleading burden and disregards the extensive factual allegations in the Complaint. A complaint "need not plead law or match facts to every element of a legal theory," *Sparrow v. United Air Lines*, Inc., 216 F.3d 1111, 1115 (D.C. Cir. 2000) (citations omitted). Instead, it must include "*some* factual basis for the allegation of a municipal policy or custom." *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (1996)(emphasis added).

In arguing that K.A. 's Monell claim is not adequately pled, the District cites *Tafler v. District of Columbia*, 539 F.Supp.2d 385, 392 (D.D.C. 2008). In *Tafler*, the plaintiff had brought a failure to train and supervise *Monell* claim alleging false arrest and excessive force against the plaintiff by one MPD officer. The court dismissed the plaintiff's case because, *at the summary judgment phase*, the court found the evidence – plaintiff's own arrest, the prior complaints against the officer, and testimony that the officer's supervisors approved of his performance –

about a single officer insufficient to show a pervasive failure to train and supervise by the city. *Id*.

The *Tafler* court distinguished its decision from that in *Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996), another police misconduct case involving a single officer shooting a machete-wielding man in broad daylight. The *Tafler* Court explained that because *Atchinson* had been decided at the motion to dismiss stage, the alleged, single incident of misconduct was "sufficiently serious and obvious to justify an *allegation* of improper training in the use of force," resulting in the reversal of district court's decision to dismiss Atchinson's claims. *Tafler*, 539 F. Supp. at 392 (D.D.C. 2008) (citing *Atchinson v. District of Columbia*, 73 F.3d at 422) (emphasis in original). The *Atchinson* court made clear that "Atchinson, of course, [would] need to *prove* more about the District's police training to prevail on the merits." *Atchinson*, 73 F.3d at 422 (emphasis in original).

Here, even at the motion to dismiss stage, K.A. alleges much more than "some" factual basis for her claims. Defendants attempt to reframe these allegations as "a single employee's misconduct" (ECF 6-1 at 12–13), but this mischaracterizes the Complaint, which alleges systemic failures across multiple staff, multiple supervisors, and multiple required policies. As described above, she alleges dozens of incidents of misconduct, involving multiple victims and multiple District employees. K.A. alleges serious and obvious *ongoing* misconduct by not only Powell, but by other District employees who either participated in the abuse of girls, or enabled him as a result of inadequacies in their own supervision and training. She alleges facts to support claims of multiple failures in training, supervision or investigation that made the abuse of K.A. not just possible, but predictable.  Taken together, K.A.'s allegations are more than "sufficiently

serious and obvious to justify an allegation of improper training" and supervision by DYRS. *Atchinson*, 73 F.3d at 422.

The District's argument that Plaintiff must provide even more examples of prior sexual misconduct by DYRS employees or more detailed reports of prior incidents is inconsistent with the standard applied at this stage. In *Goodwin v. District of Columbia*, this Court held that a plaintiff need only allege "an official municipal policy of some nature that caused the constitutional tort." 579 F.Supp.3d 159 (D.D.C. 2022) citing *Hurd v. District of Columbia*, 997 F. 3d 332 (D.C. Cir. 2021). In support of its Monell claim, the plaintiff in *Goodwin* but generally cited two MPD protestor policies and alleged that those policies were the moving force behind their First and Fourth Amendment violations. *Id*. The Court found those allegations sufficient to support a *Monell* claim. Here, K.A. provides substantially more factual matter than the plaintiff in *Goodwin*. She alleges years of prior misconduct by Powell, known to the District. She alleges that supervisors and staff knew of or saw Powell's misconduct and did nothing. She alleges Powell's facility-wide reputation amongst staff including supervisors for his sexual proclivities towards young girls. She alleges that the District was aware of Powell's prior sexual misconduct and the misconduct he displayed at the time K.A. was assaulted. She alleges other DYRS staff sexually abused children with the help of Powell. She alleges misconduct against multiple girls involving other DYRS staff members who watched videos of Powell having sex with a child. She alleges documented videotaped abuse went unwatched or watched and uninvestigated. K.A. alleges that all of this was ignored by the District, allowing Powell to groom and prey on K.A. under the watchful of surveillance cameras, and assault her dozens of times.

Inaction, such as failing to investigate, train, and supervise employees, can constitute policy or custom under *Monell* when the failure amounts to deliberate indifference towards a person's constitutional rights. *Tafler v. District of Columbia*, 539 F. Supp. 2d 385, 391 (D.D.C. 2008)(internal quotations and citations omitted); *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 139 (D.D.C. 2003). K.A. alleges that the District's failure amounts to deliberate indifference here.

K.A. has also sufficiently pleaded deliberate indifference with regard to her *Monell* claims based on the District's failure to investigate, supervise and train its employees. K.A. alleges facts reflecting that the District knew or should have known that failure to investigate Powell's prior incidents of sexual misconduct with detained girls, would embolden Powell and facilitate his continued access to girls like K.A. It knew or should have known that the failures to supervise and train Powell regarding the DYRS staffing policy would enable him to continue to easy access to K.A., and opportunities to groom, prey on and/or sexually assault her, whether on the girls' unit, the hallways or during Level 5 phone calls. It knew or should have known of the risk of sexual misconduct to detained girls that flowed from failing to supervise and train the DYRS staff responsible for monitoring the surveillance cameras, including ensuring that they monitored the actions of DYRS staff and adherence to staffing policies.

## II.    K.A.'s Plausible Claims for Negligent Hiring, Training, and Supervision.

K.A.'s negligent hiring, training and supervision claims are not duplicative of the ordinary negligence claims. "Respondeat superior liability is distinct from negligent supervision liability." *Lin v. District of Columbia*, Civil Action No. 16-645 (CKK), 2019 U.S. Dist. LEXIS 64056, at 48 (D.D.C. Apr. 15, 2019 (*Flythe v. District of Columbia*, 19 F. Supp. 3d 311, 317 n.5

(D.D.C. 2014). Courts have only dismissed these common law direct liability claims when the defendant demonstrated that they caused unnecessary prejudice to the defendants in light of the respondeat superior claims, which the defense fails to do here. *Id*. at 49 (D.D.C. Apr. 15, 2019). Should the Court deem it appropriate to consider dismissing the negligent hiring, training, and supervision claims in light of the District conceding potential liability, the court can evaluate the issue once informed by how the parties have developed their claims, at the time of trial. *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 48 (D.D.C. 2015) ("At this stage of the litigation, the Court does not know how the negligence claims against the District and the individuals will develop and what evidence Kenley will seek to offer in support of them. It thus believes that it would be improper, at this time, to determine whether allowing such claims to stand could prejudice Defendants.").

Similarly, the District's argument that K.A.'s negligent hiring, training, and supervision claims should be dismissed for failure to state a claim disregard her well-pleaded factual allegations and should be denied.

### A.  Negligent Training and Supervision[3]

The District argues that K.A.'s claims for negligent training and supervision fail due to a lack of plausible allegations of actual or constructive notice overlooking the extensive factual detail in the Complaint. To prevail on this claim, a plaintiff must show that "an employer knew

---

[3] The District argues that K.A.'s negligence claim based on the failure to enact and enforce policies, "is not a recognized tort" and warrants dismissal. (EFC 6-1 at 18). This refers to K.A.'s negligence theory that the District breached its non-delegable custodial duty to protect K.A. by failing to implement and enforce mandatory safety protocols designed to prevent the sexual abuse of minors in their care. K.A. intends to file a motion to amend her complaint, in which these allegations will be subsumed in the negligent supervision and training claim and/or negligence claims.

or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

K.A. has far surpassed her minimal pleading burden. In *James v. District of Columbia*, this Court held that the plaintiff met the pleading standard for negligent supervision and training where it had alleged that the plaintiff was attacked by police officers who had "gone rogue" while acting under the color of law, that the District of Columbia was responsible for training, supervising and disciplining them, and that failures to do so had caused the plaintiff's injuries. 869 F. Supp. 2d 119 (D.D.C. 2012). This Court found that these few assertions, while "minimal," and "somewhat thin" were sufficient to meet the pleading standard for negligent training and supervision, and put the defendant on "fair notice" of the claim's grounds under *Twombly*. *Id*. at 121-122 (citing *Twombly*, 550 U.S. at 555).

Similarly, in *Spicer v. District of Columbia*, the Court held that the negligent supervision claim of an inmate, who was attacked by guards, survived the motion to dismiss stage, though "barely," by alleging simply that a supervisor had failed to "adequately supervise the other officers of the night of the incident", and knew or should have known that the guards behaved in a dangerous manner. 916 F. Supp. 2d 1, 3-4 (D.D.C. 2013). These allegations had put the District sufficiently on notice, with the Court emphasizing that "the burden at the pleading stage is minimal." *Id*. at 4

Here, unlike the plaintiffs in *James* or *Spicer*, K.A. details actual and/or constructive notice, including multiple, documented prior incidents and formal complaints of sexual misconduct of which supervisors were aware, as described *supra* with regard to her *Monell*

20

claim. Further, K.A. alleges that during the months over which K.A. was assaulted, Powell openly and repeatedly violated staffing policies prohibiting males on the girls' unit alone and males escorted detained girls. Powell had a reputation for misconduct that earned him the nickname, "Red Roof Inn", due to widespread knowledge of his misdeeds. He had kissed a former YSC resident at a DYRS Hygiene Drive, a public community event and a reasonabl inference can be drawn that DYRS staff and supervisors who hosted the event saw this. All of this taken together clearly   supports the inference that the District had actual or constructive knowledge  of Powell's dangerous behaviors.

The District asserts that because K.A. does not identify date and times for each incident of Powell's prior sexual misconduct, that the incidents should be disregarded pursuant to Fed. R. Civ. P. 9(f). But this rule does not impose a particular date specificity. Nor does the District cite supportive caselaw applying Fed. R. Civ. P. 9(f) in this manner. K.A. need not allege the exact chronology of every incident. K.A. pleads more than sufficient factual content regarding the prior incidents to put the District on notice of her claim.

Moreover, as described *supra* with regard to K.A.'s *Monell* claims, K.A. alleges that surveillance footage captured Powell's ongoing misconduct, including violations of staffing policies (being on the girl's unit alone, taking K.A. alone  to make Level 5 phone calls, going into her cell alone); sexual misconduct (Powell grabbing K.A.'s buttocks while decorating an office door, lurking at her cell door and ogling, using gestures outside of her cell to coerce K.A. to perform sexual acts inside her cell). Plaintiff alleges that DYRS staff actually viewed this footage in real time on surveillance footage. At the pleading stage, these allegations support the

inference that the District "knew or should have known" of Powell's dangerous misconduct and propensities.

### B. Negligent Hiring

The District asserts that K.A.'s negligent hiring claim relies on "legal conclusions" and "alleges no facts pertaining to Powell's hiring." ECF 6-1 at 18. But, K.A. pleading burden is met by alleging facts that create a plausible inference of a failure to conduct an adequate screening process. K.A. accomplishes this by specifically alleging that the District was negligent in hiring Powell, having failed to exercise ordinary care despite knowing or having reason to know about his dangerous propensity to sexually abuse children. ¶¶130-132. K.A.is not required to detail an employee's confidential personnel file at this stage.

Given the employer's obligation to reasonably investigate an employee's past record (*Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 431 (D.C. 2006)), the Court can draw the reasonable inference that the District's failure to conduct an adequate vetting process allowed Powell's sexual predilections to be overlooked at hiring. K.A. has pled all that is required to survive a motion to dismiss, as the complaint need not allege with specificity every element in every cause of action. If the Court is inclined to dismiss this claim, Plaintiff respectfully requests the Court allow her to amend her complaint.

### III. Plaintiff Adequately Plead Negligent and Intentional Infliction of Emotional Distress

### A.        Intentional Infliction of Emotional Distress (IIED)

Defendants argue that an IIED claim is only proper against Powell because K.A. hasn't demonstrated that Powell was acting the scope of his employment during the relevant conduct.

"The District of Columbia, however, does not subscribe to the blanket proposition that sexual assaults never come within the scope of employment; instead, courts here look at the factors involved in each case." *Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011).

District of Columbia law defines scope of employment as such: (1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master. The test for scope of employment is an objective one, based on all the facts and circumstances." *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986)

The first prong favors K.A. because her abuse occurred while she was detained at YSC, and was forced into contact with Powell due to his supervision of her as a YDR. *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664 (2006) citing *Weinberg* at 992 (The first prong's inquiry, "focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.") He acted as her guard, and monitored and supervised her in the girls' unit as a part of that employment duty.

The second prong also favors K.A. Again, all of the alleged misconduct occurred on the YSC premises, during work hours, in spaces in which YDRs are required to be for the purpose of their job duties.

As to the third prong, Powell's actions were motivated by a partial desire to serve the master, which is sufficient. *Brown v. Argenbright Sec., Inc.* ("While it is probable that the vast majority of sexual assaults arise from purely personal motives, it is nevertheless possible that an employee's conduct may amount to a sexual assault and still be actuated, at least in part, by a desire to serve the employer's interest." 782 A.2d 752 (D.C. 2001) (internal quotation marks and alterations omitted). The work of a YDR involves supervising and monitoring youth, in effect, controlling their movements and watching them at all times. Control is central to sexual abuse.

Powell's grooming and preying on K.A., and even sexually assaulting her, was an outgrowth of his efforts to control her in service of his employer, not just satisfy his sexual interests. ¶177. In this way, the allegations making out the third prong, overlap with the fourth prong. This custodial control involves control of K.A.'s freedom and movements, in a 24-hour a day, restrictive setting. K.A.'s allegations regarding her detention in a custodial setting, supervised and monitored by Powell, support the inference that there was a relationship to the service that he provided to DYRS and his misconduct; his duties did not merely prove an opportunity for the tortious conduct. *Adams v. Vertex, Inc.*, No. 04-01026 (HHK), 2007 U.S. Dist. LEXIS 22850, at *25 (D.D.C. Mar. 29, 2007). This distinguishes K.A.'s case from *Boykin v. District of Columbia*, 484 A.2d 560, 563 (D.C. 1984), which involved a school employee whose contact with the abused student, a blind girl, was limited to assisting her with walking, which might involve holding her by the hand or guiding her around obstacles. *Id*. at 562. Thus, the fourth prong also favors K.A. at the pleading stage. For Powell's extensive, complete control over her in a carceral setting made his contact with her much more than incidental to his misconduct.

**B. Negligent Infliction of Emotional Distress**

Defendants argue that Plaintiff failed to properly plead a special relationship required for the Negligent Infliction of Emotional Distress (NEID) claim citing *Lesesne v. District of Columbia*, 146 F.Supp. 3d 190 (D.D.C. 2015). Crucially, *Lesesne* was decided on a motion for summary judgment, not a motion to dismiss. Moreover, the court in *Lesesne* did not conclude that the inmate-custodian relationship could never qualify as a special relationship. Instead, the *Lesesne* court found that the plaintiff failed to present the expert testimony necessary—at the summary judgment stage—to satisfy the second prong of the special relationship test concerning the emotional well-being of others. *Id*. The instant case is distinguishable in every critical respect. This case is in a different posture than *Lesesne* at a motion to dismiss stage, not summary judgement. Unlike the plaintiff in *Lesesne*, Plaintiff here has affirmatively pleaded the existence of the special relationship between Plaintiff and Defendants agree. ECF 6-1 at 22 "Plaintiff alleges special relationship at least three times."). Having surpassed the necessary pleading requirements, Plaintiff has preserved the opportunity to secure the expert testimony required to establish the emotional component for the NEID claim at the appropriate time.

While Plaintiff does not outright plead a zone of danger theory by name, Plaintiff does not have to use magic words or recite the doctrine by name. The Court here can determine that the facts in Plaintiff's Complaint plausibly support the elements for a zone of danger theory. There is a zone of danger if Defendants negligent placed Plaintiff in immediate risk of physical harm and she suffered emotional distress. Those facts are amply present here: K.A. as a child was repeatedly sexually assaulted in a detention facility, she was there against her will and she had no way of escaping. Plaintiff alleges that Defendants' conduct of being deliberately

indifferent to repeated sexual assault and Powell's dangerous behavior created a direct and imminent threat of physical injury-Plaintiff being repeatedly raped and assaulted-provoking fear, shock, and continuing emotional harm. From these facts, a zone-of-danger theory is not only plausible, it is the most natural inference. Accordingly, the NIED claim is properly pleaded.

## B. Plaintiff Plausibly Pled Liability Even if the Court Finds in the Alternative, that Powell Acted Outside the Scope of His Employment

Even if the Court were to find that Powell's sexual assaults were outside the scope of his employment, the District may still be held vicariously liable under the doctrine of *respondeat superior* if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation was aided in accomplishing the tort by the existence of the agency relation." *See Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011) (citing Restatement (Second) of Agency § 219(2)(d)). This rule of liability is met when the tort is "accomplished by an instrumentality, or through conduct associated with the agency status," which includes a showing that the employee's conduct was "in furtherance or was an integral part of their duties." *Id.* at 388.

Unlike cases where an employee's misconduct is wholly separate from their duties, Powell's sexual misconduct was directly integrated with his official employment responsibilities. The Complaint alleges that Powell was committing the assaults while performing his work duties, such as escorting youth for Level 5 phone calls, thereby transporting K.A. to offices for assault; monitoring the cells on the girl's unit, which enabled him to be the lone male staff member on the unit, lurk outside K.A.'s cell, gesture to her, and enter her cell alone; and being

present in offices where he committed sexual touching under the guise of work activities, such as when he grabbed K.A.'s buttocks as she decorated an office door.

In each instance, the agency relation was the essential instrumentality that granted him the access, proximity, and authority to groom and assault K.A. And in each instance, Powell committed these crimes to further the interests of DYRS in making sure that the cells were monitored, children were taken to level 5 calls and that his duties were completed. His misconduct was not an independent act, but one seamlessly interwoven with and dependent upon his official, mandated duties as a YDR. Powell's actions were clearly executed under his authority as a correctional officer. As an involuntarily detained minor, K.A. was subject to the control of YSC and Powell. Powell, as an adult, exercised complete control over K.A.'s movements and location, placing him in an unequivocal position of authority that a child of K.A.'s age could not reasonably question or resist. When an adult instructs a child, it is both expected and foreseeable that the child will rely on the adult's apparent authority, assuming the adult possesses superior knowledge, judgment, and the right to give such directions. In this context, K.A.'s reliance on Powell's asserted authority was not only reasonable—it was inevitable. K.A. therefore necessarily relied on Powell's actual and apparent authority to command her movements throughout the detention center and the movements he commanded her to do.

This case is distinguishable from others where the court has found plaintiffs were not relying on the defendant's authority. For instance in *Doe*, the plaintiff was assaulted while she was asleep and the court found that she could not have had the opportunity to make the determination about relying on the perpetrators authority. *Id*. at 391; also *see Zagami v. HP Enter*.

*Servs., LLC* (The court held that the employee, by abruptly and indiscriminately shooting twelve people at work, was not acting under apparent authority, as his victims had no opportunity to determine whether to rely on the alleged authority). Here, Powell sexually assaulted K.A. while she was awake, not abruptly, numerous times, as a guard in full control of her movements, and she had every opportunity to rely on his apparent authority, and she did.

Notably, the court in *Doe* allowed Plaintiff to proceed under the second prong —aided in accomplishing the tort by the existence of the agency relation— given the unresolved factual questions about whether the defendant's agency status facilitated the tort. *Id*. The Court should adopt the same reasoning here. The commentary to the Restatement confirms that this approach "holds the employer liable only if the tort was 'accomplished by an instrumentality, or through conduct associated with the agency status.'" *Id.* citing *Gary v. Long*, 59 F.3d1391 (D.C. Cir. 1995). The facts of this case stand in stark contrast to those where the court declined to impose employer liability, such as in *Gary*. The court in *Gary*, on *a motion for summary judgement* analyzed the Restatement (Second) of Agency § 219(2)(d) in the hostile work environment context and WMATA's liability for an employee's sexual harassment. The court dismissed the vicarious liability claim reasoning that the plaintiff could not have believed nor does she claim that the employee who sexually assaulted her was acting within the color of this authority. *Id*. An employer may not be held liable for a supervisor's hostile work environment harassment if the employer can establish it had adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct and that she could report it to the employer without fear of adverse consequences. *Id.* at 1398. In *Gary*, WMATA was found to have taken "energetic measures to discourage sexual harassment in the workplace," including having an active and firm policy against sexual

harassment throughout the period of Plaintiff's alleged mistreatment, sponsoring seminars on the subject, distributing staff notices to all employees informing them that sexual harassment would not be tolerated, publicizing its Civil Rights policy statement, and made available to all employees the names and telephone numbers of the EEO Counselors to whom they could report acts of discrimination. *Id*. Here, Plaintiff alleges that Defendants did the exact opposite of what WMATA did in *Gary*, and failed to enforce their policies and conversely maintained a custom of non-enforcement whatsoever. Defendants' failure to train and supervise their staff represents the antithesis of the "energetic measures" required to discourage harassment. Furthermore, Plaintiff here was a child, not an adult, who was being sexually assaulted by an adult employee who worked at the very facility she was held in creating a clear and reasonable inference that she feared adverse consequences for reporting the assault.

Plaintiff's detailed allegations, taken as true, plausibly allege that even if Powell was acting outside the scope of his employment, the District can still be held liable. Accordingly, vicarious liability should not be dismissed at this juncture.

### V. Conclusion

For the reasons set forth above, Defendants' motion rests on an improper reading of Plaintiff's Complaint, an unfounded restrictive view of the Rule 12(b)(6) standard, and a misapplication of controlling D.C. and federal precedent. Defendants' Motion invites the Court to impose evidentiary burdens that have no place at the pleading stage. Plaintiff's Complaint alleges extensive factual detail describing Defendants long-standing policy failures, supervisory inaction, disregard of mandatory safety procedures, and failure to protect a vulnerable youth in its custody that led to her being traumatized. These allegations must be accepted as true at this

stage, and they easily satisfy the liberal plausibility standard governing motions to dismiss. Plaintiff respectfully requests that the Court deny the District Defendants' Partial Motion to Dismiss in its entirety or in the alternative, grant Plaintiff leave to amend her Complaint pursuant to FRCP 15(a)(2).

Respectfully submitted,

Elizabeth Paige White
Bar No. 1719072
EPW Law PLLC
1601 Connecticut Avenue Northwest
7th Floor
Washington, D.C. 20009
paige@epwlawpllc.com

_____/s/_____
Bernadette Armand
Bar No. 1025527
Armand Law PLLC
1601 Connecticut Avenue Northwest
7th Floor
Washington, D.C. 20009
bernadette@armandlaw.com