**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

K.A.,

               *Plaintiff,*                         Civil Action No. 1:25- cv-2930 (SLS)

        v.

THE DISTRICT OF COLUMBIA, *et al*.,

               *Defendants.*

---

**AMENDED COMPLAINT**

1.      The Defendants failed to protect the constitutional rights of K.A., who was in their custody and responsible for her care, by subjecting her to ongoing and repeated sexual assault. Plaintiff K.A., a vulnerable child entirely dependent on Defendants for her safety, was repeatedly sexually assaulted by Defendant Kelvin Powell, a District of Columbia Department of Youth and Rehabilitation Services employee tasked with protecting and keeping her safe at DC's Youth Services Center ("YSC").

2.      From December 2021 to February 2022, at YSC, Powell repeatedly sexually assaulted K.A. by raping her, groping her, forcing her to receive and perform oral sex, and subjecting her to his voyeurism. The District of Columbia, through the Department of Youth and Rehabilitation Services ("DYRS"), failed K.A. and other children at YSC, turning purported rehabilitative detention into a nightmare of sexual predation.

3.      For assaulting K.A., Powell was criminally charged by the United States Attorney's Office for the District of Columbia. On January 10, 2024, Powell was

1

indicted on sixteen counts of First and Second Degree Sexual Abuse of a Minor and First and Second Degree Sexual Abuse of A Ward. On July 1, 2025, a D.C. Superior Court jury returned a verdict of guilty on all counts. He was subsequently sentenced to 20 years of incarceration.

4. At Powell's sentencing, on September 12, 2025, the presiding D.C. Superior Court judge stated, "DYRS did not protect you, [K.A.]. They did not protect you from the behavior that was going on right under their nose."

5. This action arises under the Fifth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, and the common law of the District of Columbia.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under D.C. Code § 11-921.

7. Written notice of these claims was provided to the Mayor of the District of Columbia and the Office of Risk Management within six months, including the approximate time, place, cause and circumstances of the assault of K.A., as required by D.C. Code §12-309.

## PARTIES

8. Plaintiff K.A. is an adult resident of the District of Columbia. At all times relevant to the Defendant's misconduct complained of herein, K.A. was a minor in the legal and physical custody of the District of Columbia, a detained "resident" of YSC, between October 2021 through her June 2022 release.

9.  Defendant District is a municipal corporation. It has, and at all relevant times to this action had, responsibility for children incarcerated under its authority, over which it exercises control through DYRS. The District is responsible for the administration of DYRS, including administration and staffing of its secure facilities. The District bears absolute, non-delegable legal responsibility and the highest duty of care, under District of Columbia law, to ensure the safety, protection, and the wellbeing of vulnerable children who are housed within its facilities, including specific duties to protect against sexual abuse and assault.

10.  Pursuant to D.C. Code §2-1515.02, the District is responsible for the safekeeping, care, and protection of all children committed to its institutions.

11.  The District is tasked with creating "environments that are safe, structured, stable and supportive" for youth.[1]

12.  The District, through DYRS, operates the Youth Services Center, a detention center that houses detained girls and boys in the juvenile justice system, located at 1000 Mount Olivet Road Northeast, Washington, D.C. 20001. As such, it is responsible for the care and custody of the young people placed in secure detention at YSC by court order from the DC Superior Court Family Court Division.[2]

13.  Defendant Kelvin Powell is a 64-year-old male resident of Temple Hills, Maryland. He is currently incarcerated at FCI Williamsburg in Salters, South Carolina, where he is serving a 20 year sentence for his sexual assault of K.A. At all times relevant to this complaint, Powell was a 60 year old male employed by the District as a DYRS staff

---

[1] "Youth Services Center," DC Department of Youth and Rehabilitation Services, https://dyrs.dc.gov/page/youth-services-center

[2] "About DYRS," DC Department of Youth and Rehabilitation Services, https://dyrs.dc.gov/node/1685381

member, specifically a "Youth Development Representative", or YDR, at YSC. Defendant Powell is being sued in his individual capacity.

14.     As an employee of the District, Powell was under its direct supervision, management, agency, and control, at all relevant times.

## FACTUAL ALLEGATIONS

15.     Defendant District had a duty to protect children in its juvenile detention system by maintaining a "juvenile system of care, rehabilitative service delivery, and security that meets the treatment needs of youth within the juvenile justice system and that is in accordance with national juvenile justice industry standards and best practices." *See* D.C. Code § 2-1515.04.

16.     The District's juvenile detention facilities, including YSC, have been historically plagued with issues of insufficient staffing and resulting assaults on youth. This history includes the "*Jerry M.*" litigation, started in 1985, in which a class of the District's detained young people sued the city under 42 U.S.C. § 1983, in the Superior Court of the District of Columbia, alleging conditions of confinement that violated their Fifth and Eighth Amendment rights. The resulting 1986 Consent Decree brought about decades of D.C. Superior Court oversight of the District's attempts to develop a system of appropriate care for detained young people, including keeping them safe from harm within the facility. Insufficient staffing levels endangering the detained youth at YSC was at issue then, and is at issue for K.A.

17.     Under *Jerry M*, the Court maintained oversight, through a court-appointed Special Arbiter, of the District's efforts to bring DYRS into compliance with the Consent Decree, including maintaining minimum staffing necessary to protect youth from assault.

18.    In 2021, the *Jerry M.* litigation, and the Court's related oversight of the District, came to an end via a settlement agreement that required the District to establish an independent office to investigate,  monitor and publicly report on the health and safety of the youth housed in DYRS facilities. Pursuant to this agreement, the District established an Office of Independent Juvenile Justice Facilities Oversight (OIJJFO), which opened with the end of the litigation.

19.    The District's OIJJFO recognized that "appropriate staffing levels are foundational to ensuring the safety and wellbeing of youth and staff" within the District's juvenile detention facilities.[3]

20.    YSC staff consists primarily of Youth Development Representatives (YDRs), equivalent to corrections officers, who provide direct and continuous observation, supervision, and on-the-spot counseling to young people in each housing unit. The primary responsibility of a YDR is to ensure the safe, healthy and orderly detention of juveniles residing at YSC.  YDRs are employed throughout the facility and are primary contact points for detained youth.

21.    YDRs are supervised by Supervisory YDRs (SYDRs), who are tasked with supervising, leading, coaching and counseling YDRs. SYDRs have offices in each unit; SYDRs responsibilities include monitoring and/or reviewing video surveillance footage

---

[3] "Report on Staffing Levels and Deployment at the Youth Services Center and New Beginnings Youth Development Center," Office of Independent Juvenile Justice Facilities Oversight, February 9, 2022, https://oijjfo.dc.gov/sites/default/files/dc/sites/oijjfo/publication/attachments/Report%20on%20Staffing%20Levels%20%26%20Deployment%20at%20the%20YSC%20and%20New%20Beginnings%202.9.22.pdf at 1.

on their respective unit. Surveillance camera footage is displayed in real time in the YSC "control room" and for SYDRs on the units.

22.    Control room staff have many concurrent responsibilities in addition to monitoring surveillance cameras, including answering phones and redirected calls, operating a switchboard that opens and closes external and particular internal doors throughout the facility to allow movement, tracking and documenting visitor movement, communicated with facility staff through radio, coordinated movement, and providing callers information on inmates and jail-related policies and procedures.

23.    Throughout the relevant period, the District was on notice that ensuring resident safety at YSC, particularly safety from assaults, necessitated a minimum staffing level of two YDRs in all YSC housing units and in the control room from 6:30 AM to 10:30 PM, and at least one YDR on these posts during the midnight shift (10:30 PM to 6:30 AM). This minimum staffing requirement was documented in the "Youth Services Center Modified Post Analysis and Staffing Complement," dated January 6, 2014, with the input of DYRS executives and managers. The District contributed to, recognized and agreed to this minimum staffing requirement, and its implementation was Court ordered. The District maintained its stated adherence to this minimum staffing level throughout K.A.'s residence at YSC.

24.    Notwithstanding the District's recognition of this minimum safety requirement and its written policy, the District's de facto staffing policy disregarded it; the District operated YSC with insufficient staff members to maintain the staffing minimums. Throughout the relevant period, it operated the control room and K.A.'s housing unit with

only one YDR during the A.M. and P.M shifts. That lone YDR on the girl's unit with K.A. was often Defendant Powell.

25.     In 2021, the OIJJFO conducted an assessment of staffing levels at DYRS' two detention facilities, YSC and the New Beginnings Youth Development Center (New Beginnings) and examined staffing levels between November 2021 into early February 2022. The study indicated "acute staffing shortages" at YSC.[4] These staff shortages impacted both YDR and Supervisory YDR positions. Shortages in YDRs, often forced SYDRs to cover YDR duties, leading to deficient supervision.

26.     The report found that as of December 6, 2021, in the midst of Powell assaulting K.A., that YSC had 28 fewer YDR positions and one fewer SYDR below minimun safety requirements.[5] The OIJJFO describes this as "the fewest number of staff at the YSC since shortly after the YSC Post Analysis was developed in January 2014."[6] The OIJJFO report notes during its December 2021 observations that many of the housing units were only staffed with 1 YDR, in violation of DYRS' policy.

27.     OIJJFO staff shared preliminary findings from its assessment with the DYRS leadership on December 13, 2021, and provided DYRS a draft report on January 21, 2022. The OIJJFO publicly reported its findings on February 9, 2022.[7]

---

[4] "Report on Staffing Levels and Deployment at the Youth Services Center and New Beginnings Youth Development Center," Office of Independent Juvenile Justice Facilities Oversight, February 9, 2022, https://oijjfo.dc.gov/sites/default/files/dc/sites/oijjfo/publication/attachments/Report%20on%20Staffing%20Levels%20%26%20Deployment%20at%20the%20YSC%20and%20New%20Beginnings%202.9.22.pdf at 13

[5] Id. at 13.

[6] Id. at 13.

[7] Id. at 1.

28.     As a result of the District's open and extended failure to assign two YDRs to each unit as required for minimum safety, Defendant Powell, a known sexual predator, was repeatedly on the girl's unit alone with K.A..

29.     Kelvin Powell began grooming K.A. in October 2021 and repeatedly sexually assaulted K.A. in December 2021, and January 2022 into February 2022.

30.     On December 15th 2021, just two days after OIJJFO staff reported its preliminary findings to DYRS leadership, Powell was alone on the A100 unit with K.A, and took her out of her cell and into another room to abuse her.

31.     On January 22, 2022, the day after DYRS received a draft of the OIJJFO Staffing Report, Powell was alone with K.A. for an extended period of time in a large YSC multipurpose room to which he transported her alone and sexually abused her.

32.     On February 4, 2022, then DYRS Director Hilary Cairns responded to the OIJJFO Executive Director Mark Jordan regarding the reported DYRS staffing shortage and claimed that the facilities, including YSC, were now appropriately staffed.  The report notes, however, that DYRS staffing numbers at the end of January 2022 were actually similar to insufficient staffing levels that OIJJFO observed in early December 2021.

33.     K.A. was raped by Powell after Director's Cairns statement in February 2022. Powell's abuse continued until K.A. bravely reported Powell.

**Powell's History of Sexual Abuse**

34.    The District was on notice that Powell was a sexual predator based on his prior reported sexual misconduct. The District knew or should have known that Powell was targeting detained youth at YSC, and of the high risk that Powell would abuse girls left in his care.

35.    Powell's reputation at YSC preceded him. Powell was open at YSC about his sexual attraction to young girls, including those detained by DYRS. DYRS staff members noted that Powell openly showed favoritism to girls over boys, and used his position to get closer to female residents. Various DYRS staff members saw, heard and reported to supervisors his abuse of YSC girls in the years leading up to his sexual assault of K.A.

36.    Powell openly and regularly sexualized girls in conversations with co-workers, including talking about their body parts. In such conversations with DYRS co-workers, he made comments about girls like, "Fifteen and sixteen [years old], pussy big, asshole blown out, I ain't got no sympathy for them."; "I'm an old man. What do I want an old bitch for?"; "Where the young girls at?"; and "I would like some of that!"

37.    Upon information and belief, Powell was known amongst DYRS staff as, "Red Roof Inn," for his habit of bringing girls released from YSC to hotels for sex; Powell regularly facilitated sex between young girls and DYRS staff in exchange for money.

38.    In about 2017 through 2019, Powell was assigned to the YSC Abscondance Unit. Abscondance Unit was tasked with traveling by DYRS vehicle in the community,

attempting to locate, detain and transport youth to return them to the facility. The abscondance unit was a smaller group, with about five team members.

39. Powell and other Absecondece Team staff were transporting D.V., a young woman, to DYRS. She had been detained for prostitution in North Carolina. Powell spent part of the drive sitting in the back of the transport van alone with D.V., while his co-workers were driving. Powell's co-workers knew Powell to switch positions to be seated as closely as possible to the detainee when they picked up a girl, but not when they picked up boys. Powell talked to the girl about her prostitution charge, attempted to recruit her as a prostitute, and told other DYRS employees that the girl was from "backpage.com" a website known for advertising prostitution services.

40. On another occasion, in the years leading up to K.A.'s assault, during a DYRS-sponsored, public community event hosted by DYRS, and attended by DYRS supervisory employees, Powell openly kissed a formerly detained young woman.

41. In 2017-2019, Powell sexually assaulted another young girl, A.M., at YSC. In the video-monitored YSC intake room, Powell touched A.M.'s buttocks, rubbed her thighs, and made sexual comments to her. He described her as having a "grown woman's body." Upon her release in the community, Powell pursued A.M. He attempted to lure her into child sex trafficking, offering her money and rides. Powell openly shared with other DYRS staff that he had been following A.M. in the community.

42. Powell had sexual intercourse with former DYRS resident, X.W. Powell was frequently seen by DYRS employees outside of DYRS with her. Powell shared with at least one DYRS co-worker that X.W. had asked Mr. Powell for money for an abortion.

10

43.    In August 2018, 3 years before K.A. was detained at YSC, Powell had sex with A.B., a 17-year-old girl who was frequently detained at YSC. Powell had approached A.B. outside, in public, directly in front of the DYRS Office building at 450 H Street, and pulled out his phone and got her phone number. DYRS staff saw Powell give A.B. his number and knew that he was sexually assaulting her.

44.    In August 2018, Powell assaulted another detained girl, E.S., by touching her vaginal and thigh areas in the video-monitored YSC intake room. Abscondance Unit members, including Powell, had just picked up and detained E.S. from the community and brought her to YSC intake for processing. Two DYRS staff members witnessed the assault.

45.    In August 2018, a few weeks after the two Abscondance Unit members witnessed Powell assault E.S., Powell approached one of the two in a room at YSC and showed him a video on Powell's phone of Powell and A.B. having sex. The staff member immediately reported the video to the other Abscondance Unit staff member who had seen Powell assault E.S., who then immediately formally reported to DYRS supervisors  their having witnessed Powell's assault of E.S.

46.    Upon information and belief, the complaint of Powell's assault of E.S. was never investigated, neither the second staff member who witnessed Powell's assault of E.S., nor Powell, was questioned regarding the assault. Powell was not disciplined or terminated. To the contrary, Powell remained on staff and was eventually assigned to work as a YSC unit YDR with even more access to children.

47.    On August 21, 2018, A.B. reported to YSC staff that another staff person had been paying her for sex. The staff person reported this information to a DYRS

supervisor. A.B. identified the staff member by the color of his uniform – a black shirt – known as the color worn by the small group of YSC Abscondance Unit staff members. Powell was a member of the black shirt unit at the time.

48.    Upon information and belief, neither Powell, nor the few other members of the black-shirted Abscondance Unit, were questioned by any investigative body related to A.B.'s report of being sexually assaulted by an apparent member of the unit.

49.    Upon information and belief, DYRS failed to report abuse, including the reported abuse of A.B. and E.S., to the Child and Family Services Agency or law enforcement officers, as required by D.C. Code § 4-1321.02 and DYRS Youth Service Center Policy.

50.    The District continued inaction in face of complaints of sexual abuse by Powell allowed him to continue abuse K.A.

**Powell's Ongoing Grooming and Sexual Assault of K.A.**

51.    When K.A. arrived at the YSC, she was assessed for her risk of sexual victimization and abusive behavior and was identified as being at risk of sexual abuse and victimization.

52.    By the time K.A. had arrived, Powell had been transferred from the Abscondance Unit to a YDR position on the YSC housing units.

53.    The District's defacto policy of having only one YDR assigned to the girl's housing unit, and insufficient staffing of YDRs and supervisors, allowed Powell to

have regular access to her for grooming and sexual assault without the risk of being interrupted, seen or reported by the another YDR or a supervisor.

54.    Upon information and belief, prior to the subject period, the District also had a long-standing policy or practice of assigning a woman YDR to the girl's unit and to transport detained girls within the facility, and not leaving male staff alone on the girls unit. This was to prevent sexual abuse in their facilities.

55.    During the subject period, DYRS disregarded this practice and customarily allowed male staff to be left alone in girl's units, for male staff to not announce themselves when they enter girl's units, and to allow male staff to transport girls alone throughout the facility.

56.    Powell never announced his presence on the girl's A100 unit where K.A. was housed, he was regularly the lone YDR on the girl's unit, and was regularly the lone YDR escorting K.A. throughout the facility.

57.    Upon information and belief, Powell's ongoing and frequent accessing of the girl's unit alone, time alone with K.A. in various parts of the facility, and transporting her alone was not the subject of any security or disciplinary review, nor corrected or disciplined by Supervisory YDRs (SYDRs).

58.    Upon information and belief, DYRS staff and supervisors regularly violated the DYRS policy prohibiting them from bringing outside meals to residents and giving special privileges and it became custom to do so. Powell openly engaged in this

conduct without reprimand by supervisors. Powell used his regular opportunities to be alone with K.A. to groom her.

59.    Powell began building intimacy with K.A. after her arrival at YSC, as a part of grooming her. He spent one on one time with her, engaged in personal conversations with her and did prohibited favors for her, such as bringing her outside meals and granting her special privileges.

60.    Powell began sexually assaulting K.A. in December of 2021.

61.    During the subject period, Powell began taking K.A. off the A100 unit alone to make level 5 phone calls.

62.    Level 5 phone calls are calls that do not have to be approved by a resident's parent or guardian and are seen as personal calls.

63.    In order to make level 5 phone calls, Powell would walk K.A. alone off of the girl's A100 unit and into an individual staff office.

64.    Powell gained access to different parts of the facility alone with K.A. with the assistance of the YSC control room staff.

65.    Throughout December 2021 and February 2022, Powell repeatedly sexually assaulted K.A. inside of the girl's unit, her cell, multipurpose rooms, hallways, and other locations in YSC, by kissing her, groping her breasts and buttocks; standing outside of her cell and directing her to disrobe and touch herself, forcing her to perform and receive oral sex, penetrating her with his penis, rubbing his penis against her buttocks.

66.    Much of Powell's misconduct in accessing K.A. was captured on YSC's security cameras.

67.    YSC is equipped with about 150 cameras, placed in the girl's A100 unit, other housing units, the intake room, hallways, and in all rooms in which detained young people are held or gathered, such as for group activities, programming, and classes.

68.    The surveillance footage is recorded and stored.

69.    Surveillance footage from December 2021 to February 2022 shows:

   a.  Powell as the lone DYRS staff member on the girl's A100 unit;

   b.  Powell repeatedly entering and exiting K.A.'s cell alone;

   c.  Powell gesturing for K.A. to go into rooms throughout the YSC, and Powell following behind her;

   d.  Powell making sexual gestures to K.A.;

   e.  Powell adjusting his mask as he enters and exits these various rooms with K.A;

   f.  Powell grabbing the buttock of K.A. as she is in hallway decorating a staff office door, and

   g.  Powell taking K.A. to various parts of the YSC alone.

70.    Powell's actions, captured on YSC surveillance cameras, indicated that Powell was sexually assaulting K.A.

71.    However, control room staff and SYDRs customarily failed to monitor or review surveillance cameras for the actions of YDRs, to prevent or identify grooming or sexual assault of residents. Upon information and belief, the District failed to train them to do so.

72.     Upon information and belief, no one viewed or acted upon surveillance footage that clearly showed Powell's ongoing and repeated grooming behavior and repeated violations of staffing policy intended to keep residents safe from abuse.

73.     These failures allowed other sexual misconduct. In February 2022, another DYRS female employee repeatedly worked while noticeably intoxicated, including interacting directly with the detained children, including K.A. She used her phone to show photos of her own naked breasts to K.A. and other girls, told them about her sex life and kissed K.A.

74.     Defendant District demonstrated shocking, systemic, and deliberately indifferent conduct amounting to reckless disregard for K.A.'s safety and well-being by chronically understaffing YSC, disregarding its two YDR per unit policy and two staff in the control room requirements, enabling Mr. Powell's repeated unsupervised access to the girls' unit and K.A., which included Mr. Powell going into unoccupied cells alone after K.A.; going into K.A.'s cell alone; knocking on K.A.'s cell in the middle of the night and making gestures to her; taking K.A. off of the unit and throughout various rooms in the facility alone; entering the offices with K.A. alone;  and grabbing K.A.'s buttocks.

75.     Defendant District created a culture, custom, and practice of ignoring sexual abuse and assault by failing to investigate or discipline staff members who knew of instances of sexual abuse, assault, or harassment against children staff and failing to report such allegations as required by law.

76.     Defendant District's misconduct created and maintained a dangerous environment in which sexual abuse by staff was foreseeable.

77. As a direct, foreseeable, and proximate result of the Defendants' misconduct, and sexual assault by Powell, Plaintiff has suffered physical harm, has and will continue to suffer severe emotional distress, humiliation and embarrassment, and has will be prevented from obtaining the full enjoyment of life, among other losses. Further, Plaintiff will incur expenses for medical and psychological treatment, therapy, and counseling.

78. All of Plaintiff's injuries and damages, past, present and prospective were, are and will be due to Defendants' actions.

79. Plaintiff requests judgment against Defendants for compensatory damages, in an amount exceeding $75,000, punitive damages as allowed under District of Columbia Law, together with pre-judgment and post-judgment interest pursuant to D.C. Code § 15-109, costs, attorneys' fees pursuant to 42 U.S.C. § 1988 and D.C. Code § 2-1403.13(e), injunctive relief requiring institutional reforms to prevent future abuse including court-appointed monitoring, and any other relief deemed appropriate by the Court and allowable under the law.

## COUNT I
### Municipal Liability Against Defendant District of Columbia

80. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 80, above as if fully stated in this action.

81. K.A. was entitled to constitutional protections under the Fifth Amendment to the United States Constitution, including detention officials taking reasonable measures to protect the safety of its detained youth.

82. The District deprived K,A. of her of her basic human need for safety by causing her to suffer serious, immediate, and proximate physical and emotional harm.

17

83.     The District had de facto policies and customs of failing to adequately and safely staff YSC, including assigning to posts, training, supervise, discipline and/or terminate staff as necessary to protect detained youth from assault, as well as failing to investigate, document and report sexual misconduct by staff.

84.     This deliberate indifference led to glaringly inadequate safety conditions for K.A,,  and were the moving force behind her sexual assault and injuries.

## COUNT II
### Negligence Against Defendant District of Columbia

85.     Plaintiff re-alleges and incorporates paragraphs 1-80, above as if fully stated in this action.

86.     As set forth above, the District breached their mandatory, ministerial and non-discretionary duties to supervise correctional staff in accordance with established departmental policies, safety protocols, and federal PREA standards, as mandated by D.C. Code § 2-1515.04 and 34 U.S.C. § 30307. These specific duties, including responding to reports of misconduct, maintaining adequate supervision ratios, monitoring surveillance footage, and protecting detainees from foreseeable sexual abuse, are not discretionary policy decisions but are instead mandatory obligations imposed by statute, regulation, and operational procedure. Because these duties are ministerial rather than discretionary, sovereign immunity does not shield Defendants from liability for their systematic failures to protect youth in their custody.

87.     The District knew or should have known that there was a high risk of sexual abuse for children at YSC and specifically, K.A..

88.     The District knew or should have known that Powell was a danger to children before he sexually abused K.A..

18

89.     Defendant District, by and through their agents, servants and/or employees, became aware, or should have become aware of Powell's propensities to commit sexual abuse and of the risks to Plaintiff's safety.

90.     The District violated their mandatory reporting obligations under D.C. Code § 4-1321.02 by failing to report known and/or suspected sexual abuse of children by Plaintiff's abusers and/or their other agents to law enforcement and Child Protective Services.

91.     Powell repeatedly sexually assaulted and abused K.A.

92.     Defendant District breached its duties to K.A. to use reasonable care to protect K.A. from the foreseeable risk of sexual abuse.

93.     Defendant District failed to use ordinary care in determining whether YSC was safe and/or determining whether it had sufficient information to represent YSC as being safe.

94.     Egregious, pervasive, and systematic breach of Defendant District's non-discretionary mandatory duties include, but are not limited to: failure to protect Plaintiff from a known and foreseeable danger of sexual assault, despite having actual notice of prior incidents, failure to supervise staff members and Plaintiff, failure to have sufficient policies and procedures in place to prevent sex abuse, failure to properly implement policies and procedures to prevent sex abuse, failure to take reasonable measures to ensure that policies and procedures to prevent sex abuse were working, failure to adequately inform children of the risks of staff-on-resident sex abuse, failure to investigate risks of staff-on-resident sex abuse, failure to properly train the staff at the facilities and/or programs, failure to train children about the dangers of sex abuse by facility staff, failure to have an outside agency test their safety procedures, failure to protect the children in their facilities and/or programs from sex abuse, failure to adhere to the applicable standard of care for resident safety, failure to

19

train their employees properly to identify signs of sex abuse by fellow employees, failing to warn Plaintiff of the risks that Powell and other staff posed and the risks of sex abuse against Plaintiff at YSC, and warn Plaintiff about any of the knowledge that the Defendant had about the persistent and prevalent sexual abuse against children by Powell and DYRS staff.

95.    The actions of Defendant District created a foreseeable risk of harm to Plaintiff.

96.    At all relevant times, the actions and deliberate failures to act by the District were negligent, willful, wanton, malicious, reckless, negligent, and outrageous in their systematic and knowing disregard for Plaintiff's fundamental constitutional rights and physical safety while in state custody.

97.    This negligence of the District caused harm to the Plaintiff and the resulting claim for damages, as described above.

### COUNT III
**Negligent Retention, Training, Supervision**
**Against Defendant District of Columbia**

98.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 80, above as if fully stated in this action.

99.    Defendant District knew or, through the exercise of reasonable care, should have known that Powell posed a risk of harm to children based on prior incidents of sexual misconduct.

100.    Defendant District was on both actual and constructive notice of Powell's previous sexual abuse of children and failed to supervise Powell during and after those prior incidents, allowing the abuse of K.A.

101.    Despite such notice, the District negligently retained Powell in a position that provided him with regular and unsupervised access to children, including Plaintiff.

102.    Defendant District failed to train and supervise staff tasked with monitoring and supervising YDRs.

103.    The District failed to enforce adequate procedures for reporting, investigating, and responding to allegations of sexual abuse.

104.    The District further failed to enforce safeguards to prevent abuse from occurring, escalating, or continuing.

105.    As a direct and proximate result of the District's negligent training, supervision, and retention of Powell, SYDRs, control room staff, and others, K.A.was subjected to sexual abuse and suffered the injuries alleged herein.

106.    The District's conduct was willful, wanton, and in reckless disregard of the safety and rights of Plaintiff.

## COUNT IV
**Negligent and Intentional Infliction of Emotional Distress Against
Defendants District of Columbia and Powell**

### A. Defendant District

107.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 80, above as if fully stated in this action.

108.    While performing YDR duties, Powell used his authority to isolate, groom, and repeatedly sexually assault Plaintiff.

109.    All of Powell's misconduct occurred within the temporal and spatial scope of his employment, including on YSC premises, during his assigned shifts, and in areas where he was authorized and required to be.

110. Powell's position did not merely provide him with an opportunity to commit abuse. Rather, his authority to control Plaintiff's movement, communication, and physical environment created the means and mechanism through which the abuse was carried out.

111. Powell's conduct was an outgrowth of, and inextricably intertwined with, the custodial authority and responsibilities entrusted to him by Defendant District.

112. In exercising that authority, Powell's conduct was actuated, at least in part, by a purpose to serve his employer, including maintaining control over detained youth and directing their movement and activities within the facility.

113. In such a setting as YSC, the misuse of that authority, including the use of force or coercion against detainees, is a foreseeable risk inherent in the nature of the work.

114. At all relevant times, Defendant District had a special relationship with Plaintiff, who was a detained child wholly dependent on Defendant District for her well-being, safety, care, and protection.

115. Defendant District exercised exclusive control over Plaintiff's environment, movement, and well-being, and Plaintiff was unable to protect herself from harm.

116. Defendant District's conduct outlined above was negligent and/or reckless.

117.   Defendant District's failures directly contributed to placing Plaintiff in repeated situations of immediate physical danger and placed her in a zone of immediate physical danger where Defendant Powell subjected Plaintiff to repeated sexual assault.

118.   Plaintiff was unable to remove herself from this zone of danger due to the custodial nature of YSC and was not free to leave or avoid contact with Defendant Powell.

119.   During these assaults, Plaintiff was in immediate risk of physical harm, including bodily injury resulting from Powell's use of force and physical domination.

120.   Plaintiff experienced fear for her physical safety contemporaneously with Defendant Powell's conduct, including fear of injury, escalation of force, and inability to escape.

121.   As a direct and proximate result of being placed in the zone of danger, Plaintiff suffered severe emotional distress, along with physical and psychological injuries as described herein.

122.   This misconduct by the District caused harm and resulting damages to Plaintiff, as described above.

**B. Defendant Powell**

123.   Defendant Powell was acting outside the scope of his official duties as a DYRS employee.

124.   Defendant Powell engaged in extreme and outrageous conduct by sexually assaulting Plaintiff.

23

125.    Defendant Powell's conduct was intentional and reckless and carried out with knowledge that it would cause Plaintiff severe emotional distress.

126.    Defendant Powell owed Plaintiff a duty to act with reasonable care and to refrain from engaging in conduct that would foreseeably cause harm, particularly given Defendant's position of authority and custodial control.

127.    Defendant Powell breached this duty sexually assaulting and sexually assaulting Plaintiff.

128.    Powell's failures caused harm and resulting damages to Plaintiff, as described above.

## COUNT VI
**42 U.S.C. 1983 Violation of the Due Process Clause of the Fifth Amendment Against Defendant Powell**

129.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 80, above as if fully stated in this action.

130.    As a pretrial detainee, Plaintiff had a constitutional right to her bodily integrity, and for YDRs to take reasonable measures to guarantee her safety and protect her from sexual abuse and assault.

131.    By the actions described above, Powell showed deliberate indifference and deprived K.A. of her liberty and basic human need for safety, causing her to suffer serious, immediate, direct and proximate physical and emotional harm.

132.    At all relevant times, Defendant's actions were intentional, malicious, and carried out in reckless disregard of Plaintiff's constitutional rights, and resulted in the above referenced damages to Plaintiff.

133.    Powell's violation of Plaintiff's constitutional rights caused harm and resulting damages to Plaintiff, as described above, arising under 42 U.S.C. 1983.

## COUNT VII
### Sexual Assault Against Defendant Powell

134.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 80, above as if fully stated in this action.

135.    Defendant used his position of power and trust to sexually abuse Plaintiff, including but not limited to kissing Plaintiff, groping Plaintiff's breast, buttocks and body, performing oral sex on Plaintiff, licking Plaintiff's buttocks, forcing Plaintiff to perform oral sex on him, and raping Plaintiff.

136.    Defendant Powell's conduct was intentional, harmful, and without legal justification.

137.    Powell's misconduct was for his own personal gratification and constituted a gross abuse of authority and a violation of the bodily autonomy and dignity of Plaintiff, , and resulted in the above-referenced damages to Plaintiff.

138.    Powell's sexual assault of Plaintiff caused harm and resulting damages to Plaintiff, as described above.

## COUNT VIII
### False Imprisonment Against Defendant Powell

139.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 80, above as if fully stated in this action.

140.    Between December 2021 and February 2022, Defendant Powell, while acting in his capacity as a YDR and YSC staff member, sexually assaulted Plaintiff by

unlawfully restraining and confining her against her will in cells, staff offices, and rooms, preventing her from leaving.

141.    Defendant Powell's conduct was intentional, harmful, and without legal justification. It was undertaken for his own personal gratification and constituted a gross abuse of authority and a violation of the bodily autonomy and dignity of Plaintiff, and resulted in the above-referenced damages to Plaintiff.

142.    Powell's false imprisonment of Plaintiff caused harm and resulting damages to Plaintiff, as described above.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully request:

a.    Compensatory damages;

b.    Punitive damages;

c.    Attorneys' fees and costs;

d.    Enter injunctive relief in Plaintiffs' favor mandating that the District:

    i.    Implement and maintain comprehensive policies and protocols in full compliance with the National PREA Juvenile Standards, 28 C.F.R. § 115.311 et seq., including but not limited to: (1) mandatory staff training on preventing, detecting, and responding to sexual abuse; (2) implementation of proper supervision protocols and staffing ratios; (3) establishment of multiple internal and external reporting mechanisms for sexual abuse; and (4) development of coordinated response protocols following reports of sexual abuse.

    ii.    Appoint an independent monitor with expertise about sexual assault in the juvenile delinquency system to ensure compliance with these conditions and provide the monitor with unfettered access to DYRS's internal processes and communications regarding children housed at YSC.

e.    Award such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims, issues, and questions of fact triable to a jury under law or equity in this matter.

Respectfully Submitted
by,

Elizabeth Paige White
D.C. Bar No. 1719072
600 Massachusetts
Avenue NW
Suite 250
Washington, DC 20001
Phone (202) 938-0363
Email: paige@epwlawpllc.com

/s/ Bernadette Armand
Bernadette Armand Law PLLC
D.C. Bar No. 1025527
400 5th Street NW, Suite 350
Washington, D.C. 20001
Phone (202) 696-4987
Email: bernadette@armandlaw.com

27