**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

K.A.,

*Plaintiff*,

v.

DISTRICT OF COLUMBIA, *et al.*,

*Defendants*.

Civil Action No. 25-2930 (SLS)
Judge Sparkle L. Sooknanan

**MEMORANDUM OPINION**

This case involves the horrific sexual abuse of a minor in the custody and care of the District of Columbia juvenile justice system. Kelvin Powell, a 60-year-old employee of the District, groomed and sexually assaulted K.A., a minor girl detained at the District's Youth Services Center. After several months, K.A. courageously reported Mr. Powell's abuse, and he was criminally charged and sentenced to 20 years of incarceration for his crimes. K.A. then commenced this lawsuit against Mr. Powell and the District of Columbia under 42 U.S.C. § 1983 and District law. As to the District, K.A. alleges (1) municipal liability; (2) negligence; (3) negligent retention, training, and supervision; and (4) intentional and negligent infliction of emotional distress. The District has moved for partial dismissal under Federal Rule of Civil Procedure 12(b)(6), seeking to dismiss all but K.A.'s simple negligence claim. The District attempts to distance itself from Mr. Powell's crimes, arguing that it is not responsible for the sexual abuse that occurred under its watch. For the reasons that follow, the Court denies the District's motion, finding that K.A. has sufficiently alleged her claims at this early stage. This case will proceed to discovery and then to summary judgment or trial.

## BACKGROUND

### A. Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Amended Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

#### 1. The District's Juvenile Detention Facilities and Staffing Policies

The District of Columbia is responsible for ensuring the safety, protection, and wellbeing of the children housed in its juvenile detention system—including protecting them against sexual abuse and assault. Am. Compl. ¶¶ 9, 10, 15, ECF No. 19. Through its Department of Youth and Rehabilitative Services (DYRS), the District operates the Youth Services Center (YSC), a detention center that houses girls and boys. *Id.* ¶ 12. There are generally three categories of YSC staff: (1) Youth Development Representatives (YDRs), (2) Supervisory Youth Development Representatives (SYDRs), and (3) control room staff. *Id.* ¶¶ 20–22.

- YDRs are the main point of contact for detained youth. *Id.* ¶ 20. Their primary responsibilities are to ensure the safe, healthy, and orderly detention of children housed at YSC. *Id.* They are the equivalent of corrections officers. *Id.* They provide observation, supervision, and counseling to young people in YSC housing units. *Id.*
- SYDRs oversee YDRs. *Id.* ¶ 21. They have offices in each unit, and they monitor and/or review video surveillance footage of their unit. *Id.* YSC's surveillance system includes about 150 cameras that record and store footage, including cameras in the girls' unit, other housing units, the intake room, hallways, and all rooms where detained young people are held or gathered. *Id.* ¶ 67–68.

- Control room staff primarily monitor security cameras, though they have additional responsibilities such as managing phone calls, opening and closing doors via switchboard, tracking visitors, and communicating with staff. *Id.* ¶ 22.

Historically, the District's juvenile detention facilities, including YSC, have been plagued with insufficient staffing and assaults on children housed there. *Id.* ¶ 16. This culminated in the *Jerry M.* litigation, initiated in 1985, where a class of plaintiffs sued the District for Fifth and Eighth Amendment violations related to their confinement. *Id.*; *see also District of Columbia v. Jerry M.*, 571 A.2d 178, 180–183 (D.C. 1990) (partially summarizing the litigation). The District resolved this matter through a consent decree, which the D.C. Superior Court supervised for 35 years. *Id.* ¶¶ 16–18. In part, the consent decree was intended to address the insufficient staffing levels at YSC. *Id.* ¶ 17. In 2021, the Parties entered into a settlement agreement to terminate the consent decree. *Id.* ¶ 18. As part of this settlement, the District established an Office of Independent Juvenile Justice Facilities Oversight (OIJJFO) to independently investigate, monitor, and publicly report on the health and safety of children housed at DYRS facilities. *Id.* Among other things, OIJJFO recognized that "appropriate staffing levels are foundational to ensuring the safety and wellbeing of youth and staff within the District's juvenile detention facilities." *Id.* ¶ 19.

K.A. alleges that throughout the period relevant to this case—between October 2021 and February 2022—the District was on notice of the minimum staffing levels required to ensure resident safety at YSC. *Id.* ¶¶ 23, 25–26. Specifically, YSC required at least two YDRs in all housing units and in the control room from 6:30 AM to 10:30 PM, and at least one YDR on these posts from 10:30 PM to 6:30 AM. *Id.* ¶ 23. The District documented this court-ordered minimum staffing requirement in the "Youth Services Center Modified Post Analysis and Staffing Complement," dated January 6, 2014, and stated that it adhered to these minimum staffing levels.

*Id.* In addition, K.A. alleges that the District had longstanding policies or practices of assigning a female YDR to the girls' unit, assigning a female YDR to transport detained girls within the facilities, and not leaving male staff alone on the girls' unit. *Id.* ¶ 54. These policies were designed to prevent sexual abuse in the District's facilities. *Id.*

According to K.A., the District disregarded these policies and insufficiently staffed YSC. *Id.* ¶¶ 24, 55. K.A. alleges that throughout the relevant period, the District operated the control room and girls' housing unit with only one YDR during the AM and PM shifts. *Id.* ¶ 24. Additionally, the District "customarily allowed male staff to be left alone in girl[s'] units, for male staff to not announce themselves when they enter[ed] girl[s'] units, and to allow male staff to transport girls alone throughout the facility." *Id.* ¶ 55.

OIJJFO reports confirm these staffing shortages. *Id.* ¶¶ 25–27. Between 2021 and 2022, OIJJFO assessed staffing levels at DYRS's two detention facilities, including YSC. *Id.* ¶ 25. The resulting study—which examined staffing levels between November 2021 and February 2022—described "acute staffing shortages" impacting both YDRs and SYDRs. *Id.* For example, as of December 6, 2021, YSC had 28 YDRs and one SYDR less than the minimum deemed necessary to meet safety requirements. *Id.* ¶ 26. According to the OIJJFO study, this was "the fewest number of staff at YSC since shortly after the YSC Post Analysis was developed in January 2014." *Id.* Furthermore, during OIJJFO's December 2021 monitoring, many of the housing units were staffed with only one YDR in violation of DYRS's policy. *Id.*

OIJJFO provided DYRS with preliminary findings from its study on December 13, 2021, and a draft report on January 21, 2022. *Id.* ¶ 27. On February 4, 2022, the DYRS Director responded to OIJJFO, claiming that the facilities, including YSC, were now adequately staffed. *Id.* ¶ 32. Despite the DYRS Director's claims, the report notes that DYRS staffing numbers at the end

of January 2022 were similar to the insufficient staffing levels reported in early December 2021. *Id.* OIJJFO publicly reported its findings on February 9, 2022. *Id.* ¶ 27.

**2. Abuse of K.A.**

K.A., a minor girl, was housed at YSC between October 2021 and June 2022. *Id.* ¶ 8. When K.A. arrived at YSC in October 2021, she was identified as being at risk of sexual abuse and victimization. *Id.* ¶ 51. For several months of her detention, Kelvin Powell, a 60-year-old male YDR, repeatedly sexually assaulted her. *Id.* ¶¶ 1, 2, 13, 29.

Mr. Powell began grooming K.A. almost immediately. *Id.* ¶ 29. He started building intimacy with her by spending one-on-one time and engaging in personal conversations. *Id.* ¶ 59. In addition, he openly gave prohibited favors to K.A.—such as bringing outside meals and granting special privileges—without reprimand from his supervisors. *Id.* ¶¶ 58–59. In fact, it was customary for DYRS staff and supervisors to regularly grant these sorts of prohibited favors in violation of DYRS policy. *Id.* ¶ 58. Mr. Powell also moved K.A. from her unit to make phone calls in an individual staff office. *Id.* ¶¶ 61–63. YSC control room staff assisted Mr. Powell as he gained access to different parts of YSC alone with K.A. *Id.* ¶ 64. And he "never announced his presence on the girl[s'] A100 unit where K.A. was housed, [] was regularly the lone YDR on the girl[s'] unit, and was regularly the lone YDR escorting K.A. throughout the facility." *Id.* ¶ 56.

From December 2021 until February 2022, Mr. Powell repeatedly sexually assaulted K.A. *Id.* ¶¶ 60, 65. These assaults occurred "inside of the girl[s'] unit, [K.A.'s] cell, multipurpose rooms, hallways, and other locations in YSC[.]" *Id.* ¶ 65. Mr. Powell sexually assaulted K.A. "by kissing her, groping her breasts and buttocks; standing outside of her cell and directing her to disrobe and touch herself, forcing her to perform and receive oral sex, penetrating her with his penis, [and] rubbing his penis against her buttocks." *Id.*

YSC's cameras captured much of Mr. Powell's conduct. *Id.* ¶¶ 69–70. For example, surveillance footage showed him "repeatedly entering and exiting K.A.'s cell alone; . . . gesturing for K.A. to go into rooms throughout the YSC, and [] following behind her; . . . making sexual gestures to K.A.; . . . adjusting his mask as he enter[ed] and exit[ed] these various rooms with K.A; . . . grabbing the buttock of K.A. as she [was] in hallway decorating a staff office door, and . . . taking K.A. to various parts of [] YSC alone." *Id.* ¶ 69. In addition, surveillance footage showed that Mr. Powell was the lone staff member on the girls' unit—which DYRS staffed with only one YDR during the AM and PM shifts. *Id.* ¶¶ 24, 69. Yet Mr. Powell's actions were not reviewed, corrected, or disciplined by SYDRs. *Id.* ¶ 57. Furthermore, because the District failed to train them, control room staff and SYDRs customarily did not monitor or review surveillance cameras to prevent or identify grooming or sexual assault by YDRs. *Id.* ¶ 71. In fact, no one viewed or acted on the footage showing Mr. Powell's grooming behavior and repeated violations of staffing policy. *Id.* ¶ 72.

Many of Mr. Powell's assaults occurred as OIJJFO staff reported the results of their study about staffing levels at YSC to DYRS leadership. *Id.* ¶ 30. Mr. Powell was alone with K.A. and abused her on December 15, 2021 (two days after DYRS leadership received the preliminary findings) and January 22, 2022 (the day after DYRS received the draft report). *Id.* ¶¶ 30, 31. Mr. Powell also raped K.A. in February 2022 soon after the DYRS Director claimed that YSC was appropriately staffed. *Id.* ¶¶ 32, 33.

K.A. was also subjected to sexual misconduct by other DYRS employees. *Id.* ¶ 73. Specifically, in February 2022, a female DYRS employee "used her phone to show photos of her own naked breasts to K.A. and other girls, told them about her sex life and kissed K.A." *Id.* This employee also repeatedly worked while noticeably intoxicated. *Id.*

Mr. Powell continued abusing K.A. until she bravely reported him. *Id.* ¶ 33. In July 2025, Mr. Powell was convicted on 16 counts related to his sexual abuse of K.A. and sentenced to 20 years' incarceration. *Id.* ¶ 3. The judge presiding over Mr. Powell's sentencing later told K.A.: "DYRS did not protect you . . . . They did not protect you from the behavior that was going on right under their nose." *Id.* ¶ 4.

As a result of the Defendants' actions, K.A. "has suffered physical harm, has and will continue to suffer severe emotional distress, humiliation and embarrassment, and has [and] will be prevented from obtaining the full enjoyment of life, among other losses" *Id.* ¶ 77. She will also incur expenses for medical and psychological services. *Id.*

### 3. The District's Knowledge

K.A. alleges that the District was "on notice" that Mr. Powell "was a sexual predator." *Id.* ¶ 34. In support, K.A. contends that Mr. Powell was open about his sexual attraction to young girls and DYRS detainees. *Id.* ¶ 35. For example, he often sexualized girls in conversations with other staff members, making comments such as: "Fifteen and sixteen, pussy big, asshole blown out, I ain't got no sympathy for them."; "I'm an old man. What do I want an old bitch for?"; "Where the young girls at?"; and "I would like some of that!" *Id.* ¶ 36.

These comments were not hypothetical. K.A. alleges that Mr. Powell repeatedly engaged in sexual misconduct before and after he sexually abused her. First, between roughly 2017 through 2019, Powell served on the YSC Abscondence Unit, which travelled in DYRS vehicles to locate, detain, and transport youth in the community to return them to YSC. *Id.* ¶ 38. During these trips, Mr. Powell attempted to recruit D.V., a young woman detained for prostitution in North Carolina, as a prostitute. *Id.* ¶ 39. He told other DYRS employees that D.V. was from a specific website known for advertising sex work. *Id.* He also spent part of the drive sitting in the back of the

transport van alone with D.V.—aligning with his known habit of switching positions in the van to sit closer to detained girls. *Id.* Second, in the years before K.A.'s assault, during a DYRS-sponsored public community event, Mr. Powell openly kissed a formerly detained young woman. *Id.* ¶ 40. Third, Mr. Powell sexually assaulted another young girl, A.M, in the video-monitored YSC intake room: He "touched A.M.'s buttocks, rubbed her thighs, . . . made sexual comments to her[,] . . . [and] described her as having a 'grown woman's body.'" *Id.* ¶ 41. Mr. Powell then openly pursued A.M. in the community upon her release from YSC, attempting to lure her into child sex trafficking. *Id.* Fourth, DYRS employees frequently saw Mr. Powell with another former DYRS resident, X.W., with whom he had sexual intercourse. *Id.* ¶ 42. Mr. Powell also told at least one DYRS coworker that X.W. had asked him for money for an abortion. *Id.* Fifth, in August 2018, Mr. Powell assaulted a detained girl, E.S. *Id.* ¶ 44. Two DYRS staff members witnessed Mr. Powell touch E.S.'s "vaginal and thigh areas in the video-monitored YSC intake room." *Id.* Sixth, also in August 2018, Mr. Powell had intercourse with a different detained girl, A.B. *Id.* ¶ 43. He approached A.B., who was 17 years old and frequently detained at YSC, directly in front of the DYRS office building to get her phone number. *Id.* K.A. alleges that DYRS staff knew that Mr. Powell was sexually assaulting A.B. and saw Mr. Powell give A.B. his number outside the DYRS office building. *Id.* Finally, Mr. Powell was frequently paid to facilitate sex between young girls and DYRS staff. *Id.* ¶ 37. In fact, DYRS staff referred to him as "Red Roof Inn" because he brought girls released from YSC to hotels for sex. *Id.*

K.A. also alleges that DYRS failed to act on abuse when it was reported. A few weeks after Mr. Powell assaulted E.S., he approached one of the staff members who witnessed the assault and showed him a video of him and A.B. having intercourse. *Id.* ¶ 45. The staff member reported the video to the staff member who witnessed Mr. Powell assaulting E.S. *Id.* That second staff member

then formally reported to DYRS supervisors that they witnessed Mr. Powell assaulting E.S. *Id.* ¶ 46. However, DYRS never investigated the assault, never conducted interviews of the staff member or Mr. Powell, and never issued any discipline. *Id.* A.B. herself also reported to YSC staff that another staff member in a black shirt had been paying her to have sexual intercourse. *Id.* ¶ 47. A small group of staff members on the Abscondence Unit, which included Mr. Powell, were known to wear black shirts. *Id.* Despite A.B.'s report, which reached a supervisor, DYRS did not question these Abscondence Unit staff members. *Id.* ¶ 48. DYRS also failed to report either of these abuse incidents to the Child and Family Services Agency or law enforcement officers, as required by law. *Id.* ¶ 49.

### B. Procedural Background

In June 2025, K.A. initially sued the District of Columbia; Sam Abed, in his official capacity as DYRS Director; and Kelvin Powell in D.C. Superior Court. *See* Compl., ECF No. 1-1. The District and Director Abed timely removed the case to this Court on the basis that it raised federal questions. *See* Not. of Removal, ECF No. 1. K.A. later amended her Complaint. K.A.'s Amended Complaint includes seven claims: (1) municipal liability by the District, Am. Compl. ¶¶ 80–84; (2) negligence by the District, *id.* ¶¶ 85–97; (3) negligent retention, training, and supervision by the District, *id.* ¶¶ 98–106; (4) negligent and intentional infliction of emotional distress by the District and Mr. Powell, *id.* ¶¶ 107–128; (5) Fifth Amendment due process violations, under 42 U.S.C. § 1983, by Mr. Powell, *id.* ¶¶ 129–133; (6) sexual assault by Mr. Powell, *id.* ¶¶ 134–138; and (7) false imprisonment by Mr. Powell, *id.* ¶¶ 139–142.[1] The Amended Complaint no longer lists Director Abed as a Defendant. *Id.* ¶ 80–142. In addition, the

[1] The Amended Complaint technically lists eight counts but erroneously skips "Count V". *See* Am. Compl., ¶¶ 80–142.

Clerk issued an Entry of Default as to Mr. Powell in December 2025. *See* Entry of Default, ECF No. 13. The District now moves for partial dismissal under Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Partial Mot. to Dismiss Am. Compl. (Mot.), ECF No. 20. The motion is fully briefed. *See* Pl.'s Opp'n, ECF No. 21; Def.'s Reply, ECF No. 22.

**LEGAL STANDARD**

Under Rule 12(b)(6), a court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). But courts need not accept as true "a legal conclusion couched as a factual allegation" nor an inference unsupported by the facts set forth in the complaint. *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**DISCUSSION**

The District moves to dismiss K.A.'s claims for (1) municipal liability; (2) negligent retention, training, and supervision; and (3) intentional and negligent infliction of emotional distress—arguing that each fails to state a claim. The Court disagrees and finds that K.A.'s claims all survive dismissal at this early stage.

**A. Municipal Liability**

In certain circumstances, individuals may sue a municipality under 42 U.S.C. § 1983 for policies or practices that result in a constitutional violation. *See Monell v. Dep't. of Soc. Servs. of New York*, 436 U.S. 658 (1978). To state a *Monell* claim, a plaintiff must properly allege: (1) "a

predicate constitutional violation" and (2) "that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Generally, an official custom or policy exists in four circumstances:

> when (1) the municipality adopts a policy that itself violates the Constitution; (2) the unconstitutional action was taken by a policy maker within the government; (3) the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware; or (4) the municipality knew or should have known of a risk of constitutional violations, but showed deliberate indifference to that risk by failing to act.

*Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (cleaned up). Importantly, local governments "are not liable for injuries inflicted solely by their employees or agents." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023). This is because the municipality's policy or practice must be the "moving force" behind the violation. *Monell*, 436 U.S. at 694.

At the outset, K.A. successfully identifies a predicate constitutional violation. She contends that as a pretrial detainee, she was entitled to Fifth Amendment protections, including the right to have detention officials take reasonable measures to protect her safety. Am. Compl. ¶¶ 81, 130. And she alleges that the District deprived her "of her basic human need for safety," *id.* ¶ 82, and subjected her to "glaringly inadequate safety conditions," *id.* ¶ 84; *see Colbert v. District of Columbia*, 78 F. Supp. 3d 1, 8 (D.D.C. 2015) ("A citizen's liberty interest, protected by substantive due process, includes a right to be free of damage to bodily integrity and security caused by the State."). She has thus carried her burden at this initial step. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (explaining that, at this stage, "[a]ll that is being established . . . is that there is some constitutional harm suffered by the plaintiff, not whether the municipality is liable for that harm").

What is left, then, is whether K.A. can show that the District maintained a custom or policy that caused this constitutional violation. K.A. pursues *Monell* liability "pursuant to the third and fourth pathways." Opp'n at 13. Specifically, she alleges "that the District maintained constitutionally injurious customs, and that the government failed to respond to a need to the point of deliberate indifference to the risk of constitutional violations." *Id.* The Court takes these in turn.

**1. Custom**

Under the third pathway, a plaintiff can sufficiently allege *Monell* liability by showing "the adoption" of a policy "through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom[.]'" *Baker*, 326 F.3d at 1306 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)); *see also Singletary v. District of Columbia*, 766 F.3d 66, 73 (D.C. Cir. 2014) (explaining that a municipal policymaker is "one with authority to 'establish governmental policy'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). This must be "persistent and widespread," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and "so engrained that it amounted to a 'standard operating procedure' of which municipal policymakers must have been aware." *Hurd*, 997 F.3d at 338 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). That said, at the motion-to-dismiss stage, there is no magic number that a plaintiff must meet when identifying examples that amount to a custom. *See Carter v. District of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986) (clarifying that strict numerical standards do not control the inquiry, especially when the misconduct is particularly egregious); *Bah v. District of Columbia*, No. 23-cv-1248, 2024 WL 983329, at *6 (D.D.C. Mar. 7, 2024) (explaining that any numerical standard is lower at the motion to dismiss stage). Here, K.A. alleges two customs: (1) "insufficient staffing and supervision" and (2) "turning a blind eye to sexual misconduct by DYRS staff." Opp'n at 13–14. At this early stage, K.A.'s allegations suffice.

*First*, K.A. alleges that the District maintained a custom of "failing to adequately staff and supervise YSC." Opp'n at 15. As K.A. explains, the District was aware of "[i]nsufficient staffing levels endangering the detained youth at YSC" as early as the 1985 *Jerry M.* litigation and the resulting consent decree. Am. Compl. ¶ 16. And the OIJJFO study in 2021 and 2022 further highlighted YSC's staffing shortages and the importance of adequate staffing to the safety and wellbeing of children detained at YSC. *Id.* ¶¶ 19, 25, 26. Despite this, K.A. alleges that inadequate staffing persisted at YSC. For example, the District routinely violated both its rule of assigning two YDRs to a unit during daytime and its longstanding practice of assigning female YDRs to monitor the girls' unit and provide transport. *Id.* ¶¶ 23–24, 54–56.

The District does not strenuously dispute its awareness of these inadequate staffing levels. *See* Reply at 3. Instead, it states that K.A. "fails to flesh out the requisite nexus between YSC staffing levels and her alleged sexual assault by Defendant Powell." *Id.* It argues that K.A. offers "*no* non-conclusory allegations, from the OIJJFO Report or elsewhere, that her sexual assault over a three-month period was a reasonably foreseeable result of staffing levels." *Id.* at 4. The District is correct that a plaintiff must allege "an 'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Baker*, 326 F.3d at 1306 (first quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); then quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). In this context, "moving force" is akin to proximate causation. *See Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005). Put differently, "[t]he policy or custom must be 'closely related to the ultimate injury,' and the court should inquire whether 'the injury [would] have been avoided' in its absence." *Id.* (alteration in original) (quoting *City of Canton*, 489 U.S. at 391). Here, the Court finds that K.A. has sufficiently alleged an affirmative link between YSC staffing policies and her alleged constitutional injury.

The Amended Complaint explains how adequate staffing levels relate to the safety and wellbeing of DYRS youth. *E.g.*, Am. Compl. ¶ 17 (discussing efforts "to bring DYRS into compliance with the Consent Decree, including maintaining minimum staffing necessary to protect youth from assault"); *id.* ¶ 19 (quoting OIJJFO's recognition that "appropriate staffing levels are foundational to ensuring the safety and wellbeing of youth and staff"); *id.* ¶ 54 (explaining that the District's previous long-standing policy of assigning female YDRs "was to prevent sexual abuse in their facilities"). Construing all factual inferences in the light most favorable to K.A., she plausibly articulates why YSC's chronic understaffing and inadequate supervision allowed Mr. Powell to groom and sexually assault her. *See* Am. Compl. ¶¶ 17, 19, 54. No more is needed at the motion-to-dismiss stage. Indeed, "the question of whether a policy or custom is the moving force behind alleged constitutional deprivations is normally a question for the jury." *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 285 (D.D.C. 2011).

*Second*, K.A. alleges that the District maintained a custom of turning a blind eye to sexual misconduct against girls detained at YSC. Opp'n at 16–18. K.A. cites a 2018 incident involving E.S. where DYRS staff formally reported Mr. Powell's misconduct to supervisors. Am. Compl. ¶¶ 45, 46. And she describes another formal report around that same time, where DYRS supervisors learned from A.B. that a member of the Abscondence Unit staff was paying her for sexual intercourse. *Id.* ¶ 47. K.A. alleges that the District did not investigate these complaints or take actions against Mr. Powell. *Id.* ¶¶ 46, 48. In addition to these formal reports, K.A. also claims that DYRS staff and supervisors were aware of Mr. Powell's depravity through informal means. For example, K.A. cites the comments described above made to his coworkers about his attraction to young girls, his "Red Roof Inn" nickname, and at least six additional incidents of misconduct or assault around his time in the Abscondence Unit. *See id.* ¶¶ 34–50.

The District counters that K.A.'s allegations are "just not enough" to show a persistent, engrained, and widespread custom. Reply at 5. At this stage of the litigation, the District is wrong. The D.C. Circuit has emphasized that the number of incidents alleged by a plaintiff is not dispositive, particularly when those instances of misconduct are egregious. *See Carter*, 795 F.2d at 124. Additionally, "courts unsurprisingly hold plaintiffs to a less demanding standard in terms of the number of prior comparators at the motion-to-dismiss stage than at summary judgment." *Bah*, 2024 WL 983329, at *6. Here, construing the facts in their totality in K.A.'s favor—as the Court must—she "raise[s] a reasonable expectation that discovery will reveal evidence" of further misconduct. *Twombly*, 550 U.S. at 556. In addition to formal complaints that the District ignored, Am. Compl. ¶¶ 45–47, K.A. cites multiple examples of Mr. Powell's misconduct of which she claims the District was aware, *id.* ¶¶ 34–50, plus security camera footage, *id.* ¶ 70, and misconduct by other DYRS employees, *id.* ¶ 73. The fact that some of these allegations are vaguely dated or occurred outside YSC may make them insufficient in isolation, but the Amended Complaint must be "taken as a whole[.]" *Bah*, 2024 WL 983329, at *7. And read in its entirety, the Amended Complaint plausibly alleged that the District maintained a custom of turning a blind eye to sexual misconduct against girls detained at YSC.

**2. Deliberate Indifference**

K.A. also seeks to establish *Monell* liability under the fourth pathway, which requires that she show that the District objectively "knew or should have known of a risk of constitutional violations but showed 'deliberate indifference' to that risk by failing to act." *Hurd*, 997 F.3d at 337 (quoting *Baker*, 326 F.3d at 1306). Deliberate indifference "does not require the [municipality] to take reasonable care to discover and prevent constitutional violations. It simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights,

the [municipality] may not adopt a policy of inaction." *Warren v. D.C.*, 353 F.3d 36, 39 (D.C. Cir. 2004). In this context, "[a]ctual or constructive notice may be shown by demonstrating '[a] pattern of similar constitutional violations[.]'" *Hurd*, 997 F.3d at 339 (alteration in original) (quoting *Connick*, 563 U.S. at 62). However, such a pattern may not be necessary when a failure to train results in a "patently obvious" unconstitutional consequence. *Connick*, 563 U.S. at 64. "The most common way of establishing deliberate indifference is by demonstrating the municipality's failure to train its employees[.]" *Harris v. Gov't of D.C.*, No. 18-cv-2390, 2019 WL 3605877, at *4 (D.D.C. Aug. 6, 2019). However, courts "have also found deliberate indifference in . . . a municipality's failure to respond to repeated complaints about misconduct." *Id.* (collecting cases).

As is typical in *Monell* cases, K.A.'s allegations under the third and fourth pathways significantly overlap. *See Tyson v. District of Columbia*, No. 24-cv-1450, 2021 WL 4860685, at *13 ("Where a plaintiff is alleging deliberate indifference based on a city's failure to respond to a pattern of misconduct . . . that analysis overlaps with the consideration of whether policymakers knowingly ignored a custom under the third [pathway]."); *Alexander v. Gov't of D.C.*, No. 17-cv-1885, 2020 WL 3573462, at *23 (D.D.C. July 1, 2020) ("[T]here is significant overlap in the allegations supporting municipal liability under the third and fourth *Baker* prongs."). K.A. alleges that the District was deliberately indifferent to the risks of chronic insufficient staffing and supervision, as well as the risks of failing to respond to its employees' sexual misconduct. *See* Am. Compl. ¶ 74. She contends that the customs identified in the third pathway prove that the District knew about those risks—risks that she alleges caused the constitutional violations. Opp'n at 19. Furthermore, she argues that "deliberate indifference is independently shown by specific institutional failures," *id.*, such as failing to investigate formal reports against Mr. Powell, Am. Compl. ¶¶ 46, 48, failing to fulfill DYRS's mandatory reporting obligations involving abuse, *id.*

¶ 49, failing to train staff to monitor surveillance footage, *id.* ¶ 71, failing to enforce minimum staffing levels, *id.* ¶¶ 23–24, and failing to implement its long-standing rule of staffing female YDRs in the girls' unit, *id.* ¶¶ 54–55.

The District broadly makes three arguments in opposition, none of which succeed. First, the District claims that it had no knowledge of the link between its staffing shortages and the threat of assault for detained girls. Reply at 7. However, as the Court already discussed, the Amended Complaint alleges otherwise. K.A. *See* Am. Compl. ¶¶ 16–19, 54, 76. Specifically, K.A. plausibly alleges that the District knew—based on prior litigation and its own internal reports—that chronic understaffing and inadequate supervision could lead to abuse yet decided not to fix the issues. *Id.* ¶¶ 24, 32.

Second, the District repeats its argument that there is no pattern of incidents from which the Court could infer that the District was aware of Mr. Powell's prior sexual misconduct. Mot. at 16–17; Reply at 6–7. The Court has rejected this argument too, explaining that a plaintiff need not allege some minimum number of incidents to establish a pattern. At the motion to dismiss stage, K.A. has articulated a sufficient pattern of misconduct to raise a plausible inference that the District turned a blind eye to what was happening at YSC. *See* Am. Compl. ¶¶ 34–50, 70, 73.

Finally, the District argues that any inadequate training related to monitoring YSC's surveillance footage was not the "moving force" behind K.A.'s constitutional injuries. Reply at 8–9. It argues that the conduct actually captured on camera does not reflect Mr. Powell's "most egregious conduct" such that improved monitoring of the facility's surveillance footage would have stopped him. *Id.* at 8. The Court disagrees. Even though surveillance footage did not capture the February 2022 rape, K.A. plausibly pleads that it captured a slew of other actions that "indicated that Powell was sexually assaulting K.A.," including Mr. Powell making sexual

gestures to K.A., grabbing her buttock, and repeatedly escorting her around the facility alone. Am. Compl. ¶¶ 69–70. Furthermore, K.A. explains that "no one viewed or acted upon" this footage, presumably because "the District failed to train them" "to monitor or review surveillance cameras for the actions of YDRs, [or] to prevent or identify grooming or sexual assault of residents." *Id.* ¶¶ 71–72. Thus, the Court draws the inference that adequate training plausibly could have created a different outcome.

In sum, particularly given the overlap between the third and fourth pathways, the Court finds that K.A. has carried her burden to proceed with her deliberate indifference claim. *See Alexander*, 2020 WL 3573462, at *8 (allowing the plaintiff to proceed on the fourth pathway because it already sided with the plaintiff as to the third pathway, and "discovery on the two theories will largely be the same").

### B. Negligent Retention, Training, and Supervision

Next up is K.A.'s claim for negligent retention, training, and supervision. To start, the District argues that this claim is duplicative of K.A.'s simple negligence claim—which the District has not moved to dismiss—because it rests on the same facts. Mot. at 17. "Claims are duplicative when they stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 19 (D.D.C. 2014) (cleaned up). "As a matter of judicial economy, courts should dismiss claims that are duplicative of other claims." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010). Here, though, the Court finds it premature to dismiss K.A.'s negligent retention, training, and supervision claim as duplicative of her simple negligence claim. Though the two claims are similarly pleaded, "[a]t this stage of the litigation, the Court does not know how the negligence claim[] against the District . . . will develop and what evidence [K.A.] will seek to offer

in support of [it].” *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 48 (D.D.C. 2015). If the claim turns out to be unnecessary or prejudicial, the Court may dismiss it down the road. *See Hackett v. WMATA*, 736 F. Supp. 8, 10–11 (D.D.C. 1990) (explaining why alternative and duplicative negligence claims may be prejudicial). But at this stage, the Court will exercise its “discretion” to retain it. *WMI Liquidating Tr. v. FDIC*, 110 F. Supp. 3d 44, 59 (D.D.C. 2015).[2]

Proceeding to the substance of the claim, K.A. pleads sufficient facts to survive the District’s motion. Under District of Columbia law, “[t]he elements of negligent training, supervision, [] and retention are substantially similar: A plaintiff must show that ‘an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner,’ and that ‘the employer, armed with that actual or constructive knowledge,’ did not adequately train, supervise, [] or retain the employee.” *Jackson v. District of Columbia*, No. 25-cv-00889, 2026 WL 890452, at *12 (D.D.C. Mar. 31, 2026) (first quoting *Thorp v. District of Columbia*, 319 F. Supp. 3d 1, 21 (D.D.C. 2018) (negligent supervision and retention); then citing *Lin v. District of Columbia*, 47 F.4th 828, 845–46 (D.C. Cir. 2022) (negligent supervision and negligent training)). These claims require “proof that the employer breached a duty to [the] plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to [the] plaintiff.” *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002);

[2] In urging otherwise, the District relies on inapposite cases. *See Leach v. Nat’l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 156 (D.D.C. 2015) (employment discrimination case where Title VII offered the exclusive remedy); *Brown v. Child.’s Nat’l Med. Ctr.*, 773 F. Supp. 2d 125, 138–39 (D.D.C. 2011) (same); *Jograj v. Enter. Servs., LLC*, 270 F. Supp. 3d 10, 24–25 (D.D.C. 2017) (plaintiffs conceded that common law negligence claims were identical to already-dismissed claims); Order Granting Def.’s Partial Mot. to Dismiss, *Laghrib v. District of Columbia*, No. 2025-CAB-007588 (D.C. Super. Ct. Apr. 14, 2026) (Superior Court dismissed negligent supervision and failure to train claim without considering whether simple negligence claim was duplicative); see Order Granting Def.’s Mot. to Dismiss, *Mason v. District of Columbia*, No. 2025-CAB-001964 (D.C. Super. Ct. Jul. 31, 2025) (plaintiff pleaded two overwhelmingly similar negligence claims).

*see also Clark v. Comput. Sci. Corp.*, 958 F. Supp. 2d 208, 214 (D.D.C. 2013) (explaining that negligent training, supervision, and retention requires a showing of common-law negligence).

The District argues (1) that K.A. has not adequately shown that the District owed her a duty, and (2) that it lacked actual or constructive notice of Mr. Powell's wrongdoing. Mot. at 17–19. The Court disagrees. First, K.A. has clearly and plausibly pleaded that the District owed her a duty as a minor detained in a DYRS facility. *See* Am. Compl. ¶¶ 9, 15. The District appears to concede as much in their reply—lamenting only that this duty is duplicative of the duty pleaded for K.A.'s simple negligence claim. *See* Reply at 10–11. Second, K.A. has plausibly alleged that the District had actual or constructive notice of Mr. Powell's extensive misconduct. As already discussed, K.A. relies on multiple formal and informal reports of Mr. Powell's misconduct, of which she contends that District policymakers knew or should have known. *See, e.g.*, Am. Compl. ¶¶ 24, 34–50, 69, 70. At the motion to dismiss stage, these allegations suffice to show actual or constructive notice. As a result, K.A. may proceed with her negligent retention, training, and supervision claim.[3]

### C. Infliction of Emotional Distress

Finally, the Court turns to K.A.'s claims for intentional and negligent infliction of emotional distress. Both claims survive the District's motion to dismiss.

#### 1. Intentional Infliction of Emotional Distress

"[To] succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Duncan v. Child.'s Nat'l Med. Ctr.*,

[3] While the District does not contest that K.A. sufficiently pleaded that it breached its duty to her, she has cleared this requirement as well. *See*, *e.g.*, Am. Compl. ¶¶ 24, 26, 28, 71, 74.

702 A.2d 207, 211 (D.C. 1997) (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994)). The District does not appear to dispute that K.A. has adequately pleaded such a claim, arguing instead that K.A.'s claim "is proper only against Defendant Powell." Mot. 20. But an employer may be vicariously liable for its employee's actions under the doctrine of *respondeat superior* if "(1) the employee's acts must have taken place within the scope of his employment or (2) arguably, he must have used his apparent authority or have been aided by his agency relationship in accomplishing them." *Doe v. Sipper*, 821 F. Supp. 2d 384, 387 (D.D.C. 2011). K.A.'s claim survives under the second theory.[4]

**a. Scope of Employment**

District of Columbia law, which governs here, "generally adheres to the analytical framework of the scope of employment inquiry set forth in the Restatement (Second) of Agency § 228(1)-(2)[.]" *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023). Specifically, an employee's conduct is "within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master." Rest. (2d) of Agency § 228(1). However, "[c]onduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a

[4] The District argues that the Court should not entertain the second aided-in-agency theory because K.A. did not plead it in her Amended Complaint. Reply at 14. This vastly overstates what is required at the pleading stage. K.A. pleaded a claim for intentional infliction of emotional distress against both the District and Mr. Powell. The District has moved to dismiss, arguing that only Mr. Powell may be held liable for that claim. And K.A. advances the aided-in-agency argument as one path of holding the District vicariously liable for Mr. Powell's conduct. Rule 8 does not require a plaintiff to plead such an argument in her complaint. *See* Fed. R. Civ. P. 8(a)(2) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief").

purpose to serve the master." Rest. (2d) of Agency § 228(2); *see also Trump*, 292 A.3d at 229 (clarifying how the District of Columbia applies the standard).

Here, K.A. has not satisfied this test. On the third requirement, she offers no non-conclusory allegations as to how Mr. Powell's conduct was intended to serve the District. To the contrary, Mr. Powell's grooming and sexual assaults "appear[] to have been done solely for the accomplishment of [his] independent, malicious, mischievous and selfish purposes." *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984). Granted, the District of Columbia "does not subscribe to the blanket proposition that sexual assaults never come within the scope of employment[.]" *Doe*, 821 F. Supp. 2d at 388; *see also Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001) (explaining that "[w]hile it is probable that the vast majority of sexual assaults arise from purely personal motives, it is nevertheless possible" that an employee's sexual assault may be actuated by a purpose to serve the master). But Mr. Powell's actions do not plausibly fit within the narrow category of cases where an employee commits sexual assault to serve his employer. For example, in *Brown*, the D.C. Court of Appeals held that a jury could find that a security guard was acting within the scope of his employment when he touched an alleged shoplifter in a sexually inappropriate manner while conducting a physical search. *Id.* at 758–59. The Court reasoned in part that the security guard initiated the search only "after he had reason to believe that his employer's interests had been affected[.]" *Id.* Here, K.A. does not adequately allege that Mr. Powell was protecting the District's interests when he sexually assaulted her. K.A.'s sole claim that Mr. Powell's "conduct was actuated, at least in part, by a purpose to serve his employer," Am. Compl. ¶ 112, is exactly the sort of conclusory allegation that is "not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679. The Amended Complaint lacks any "direct and circumstantial evidence of [Mr. Powell's] state of mind" that would allow a factfinder "to make

inferences about whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated." *Trump*, 292 A.3d at 235. Therefore, K.A. may not proceed with her claims under the scope-of-employment theory.

**b. Aided-in-Agency**

Though a closer call, K.A. can proceed with her intentional infliction of emotional distress claim against the District under the aided-in-agency doctrine, which is rooted in Restatement (Second) of Agency § 219(2)(d). Though the District of Columbia has "not expressly adopted" this provision in assessing common-law claims, *Buie v. District of Columbia*, No. 16-cv-1920, 2023 WL 6142139, at *16 (D.D.C. Sept. 20, 2023), the District does not dispute its applicability here, Reply at 14–15. So the Court will assume without deciding that K.A. may rely on this theory. *See Doe*, 821 F. Supp. at 391 (D.D.C. 2011) (applying Section 219(2)(d) "[g]iven the preliminary posture of the case, the parties' positions, and the lack of direct briefing").

Section 219(2)(d) states that "[a] master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . . the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." The Restatement commentary "suggests that this exception embraces a narrower concept that holds the employer liable only if the tort was accomplished by an instrumentality, or through conduct associated with the agency status." *Gary v. Long*, 59 F.3d 1391, 1397 (D.C. Cir. 1995) (quotation omitted) (discussing Restatement § 219 cmt. e). For example, "a telegraph company may be held liable for a tort committed by a telegraph operator who sends a false telegraph message, as may the undisclosed principal of a store whose manager cheats a customer." *Id.* But, a plaintiff cannot prevail if she

does not reasonably believe that the employee "was acting within the color of his authority or that his actions were somehow condoned[.]" *Buie*, 2023 WL 6142139, at *17.

K.A.'s claim narrowly clears this threshold. The Amended Complaint sufficiently alleges both that Mr. Powell was able to groom and sexually assault K.A. because of his role as a YDR and that K.A. reasonably relied on that apparent authority. *See* Am. Compl. ¶¶ 50–64. *Buie v. District of Columbia*, 273 F. Supp. 3d 65 (D.D.C. 2017), is illustrative. In that case, a plaintiff sued the District of Columbia Metropolitan Police Department after a police officer sexually assaulted her. *Id.* at 66. The court denied the District's motion to dismiss, finding that the plaintiff had sufficiently alleged vicarious liability under Section 219(2)(d). *Id.* at 68. The *Buie* court pointed to multiple facts "plausibly suggesting that [the officer] was purporting to act on behalf of the MPD," including that the officer was armed, wearing his full police uniform, drove his official police vehicle, and used his credentials to access the garage, elevator, and his office. *Id.* at 69.; *see also Sipper*, 821 F.Supp. 2d at 393 (declining to dismiss a claim that a company executive used the instrumentalities of his position to rape an employee). Similarly, here, Mr. Powell relied on his authority and access as a YDR to groom and sexually assault K.A. It is certainly plausible that K.A., a minor, understood Mr. Powell to be acting within his authority as a YDR on behalf of DYRS.

The Court recognizes the District's concern that allowing K.A.'s claim to proceed would make employers vicariously liable for "every plaintiff harmed by every workplace tort." Reply at 15. This concern is overblown, particularly at this early stage of the litigation. The District will have an opportunity at summary judgment or trial to make its case. But construing the facts in K.A.'s favor, she has plausibly pleaded vicarious liability under the aided-in-agency doctrine.

### 2. Negligent Infliction of Emotional Distress

In the District of Columbia, a plaintiff may show negligent infliction of emotional distress under two theories: the "special relationship" theory and the "zone of physical danger" theory. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011) (en banc); *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 207 n.17 (D.D.C. 2025). The Court addresses these in turn.

To succeed on the "special relationship" theory, a plaintiff must show that:

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Hedgepeth*, 22 A.3d at 810–11. Here, the District argues that K.A. offers nothing but legal conclusions to support her claim. Reply at 14 (citing Am. Compl. ¶ 114). And it contends that there is no special relationship between YDRs and the children in their care because "courts have been reluctant to recognize a special relationship between correctional officers and persons in custody[.]" Mot. at 21 (citing *Lesesne v. District of Columbia*, 146 F. Supp. 3d 190, 196 (D.D.C. 2015)). The Court disagrees. K.A. does more than plead legal conclusions. She alleges that she was "wholly dependent" on the District for her safety, Am. Compl. ¶ 114, and that the District "exercised exclusive control over [her] environment, movement, and well-being," such that she "was unable to protect herself from harm," *id.* ¶ 115. And she argues that the District has "responsibility for children incarcerated under its authority" and "bears absolute, non-delegable legal responsibility and the highest duty of care, under District of Columbia law, to ensure the safety, protection, and the wellbeing of vulnerable children who are housed within its facilities, including specific duties to protect against sexual abuse and assault." *Id.* ¶ 9. These allegations raise a plausible inference that the District had a special relationship with K.A. and other children

detained at YSC. Furthermore, *Lesesne* is not dispositive for two reasons. First, *Lesesne* involved an adult plaintiff detained at the Department of Corrections, so it may apply with less force to minors detained at YSC. 146 F. Supp. 3d at 196 (acknowledging that the D.C. Court of Appeals has explicitly "mentioned appointed guardians and counsel for children . . . as caretakers whose activities have the potential to implicate emotional well-being") (citing *Hedgepeth*, 22 A.3d at 814). Second *Lesesne* was decided at summary judgment, 146 F. Supp at 196, whereas K.A. has not yet had the benefit of discovery. Accordingly, K.A. has done enough to proceed to discovery.

Turning to the "zone of danger" theory, a plaintiff must prove that she (1) "was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for [her] own safety, and (4) the emotional distress so caused was serious and verifiable." *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011). In addition, "the plaintiff's presence in the zone of danger be contemporaneous with her fear for her own safety." *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 423 (D.C. 1991). Here, too, K.A.'s claim survives. The District devotes only a handful of sentences to this argument, Mot. at 21–22; Reply at 14, which do not move the needle. K.A. has adequately alleged (1) that she was in the physical zone of danger by virtue of being detained at YSC and having her movements controlled by YDRs, *see, e.g.*, Am. Compl. ¶¶ 22, 110, 118; *see also Nagy v. Corr. Corp. of Am.*, 79 F. Supp. 3d 114, 121 (D.D.C. 2015) (plaintiff beaten by corrections officers in prison satisfied the zone of physical danger test); (2) that her physical danger was linked to the District's alleged negligence; (3) that she experienced a contemporaneous fear for her physical safety while in detention given Mr. Powell's repeated sexual assault; and (4) that she "suffered physical harm, has and will continue to suffer severe emotional distress, humiliation and embarrassment, and has [and] will be prevented from obtaining the full enjoyment of life, among other losses," Am. Compl. ¶ 77. These allegations are "serious

and verifiable" at this stage of the litigation. *See Whittaker v. Ct. Servs. & Offender Supervision Agency for D.C.*, 401 F. Supp. 3d 170, 187 (D.D.C. 2019) (declining to dismiss allegations that plaintiff "experience[d] extreme emotional distress and harm").

Thus, K.A. sufficiently states a claim for negligent infliction of emotional distress under both the "special relationship" and "zone of physical danger" theories.

## CONCLUSION

For the foregoing reasons, the Court denies the District's Partial Motion to Dismiss the Amended Complaint, ECF No. 20. A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: September 28, 2026